Mr. Justice STRONG
 

 delivered the opinion of the court.
 

 It is not contended in this case that the contract between the parties contains any express undertaking to pay what the company assumed to pay, either in coin or in any specified kind of money, or with anything other than that which might be a legal tender for the payment of debts, when the time for payment should arrive. But the argument on behalf of the State is, that the language used implies an undertaking to pay in coin, and that the case is therefore within the principle laid down in
 
 Trebileock
 
 v.
 
 Wilson.
 
 Conceding that such an undertaking may be implied, when there is no express promise to pay in gold, still the implication must be found in the language of the contract. It is not to be gathered from the presumed or the real expectations of the par
 
 *112
 
 ties. As was said in
 
 Knox
 
 v. Lee,
 
 *
 
 “ the expectation of the creditor and the anticipation of the debtor may liare been that the contract would be discharged by the payment of coined money but neither the expectation of one party nor the anticipation of the other constitutes thé obligation of the contract. There is a well-recognized distinction between the expectation of the parties to a contract and the duty imposed by it. Were it not so, the expectation of results would always be equivalent to a binding engagement that they should follow.” There is sound reason in what was said by Lord Denman in the Queen’s Bench, in
 
 Aspiiin
 
 v. Austin,
 
 †
 
 which was an action upon a covenant. “ Where parties,” said his lordship, “have entered into written engagements with* express stipulations, it is- manifestly not desirable to extend them by any implications. The presumption is that, having expressed some, they expressed all the conditions by which they intend to be bound under that instrument. It is possible that each party to the present instrument,” said he, “ may have contracted on the supposition that the business would in fact be carried on and the service in fact be continued during three years, and yet neither party be willing to bind themselves to that effect; and it is one thing for the court to effectuate the intention of the parties to the extent to which they may have even imperfectly expressed themselves, and another to add to the instruments all such covenants as upon a full consideration the court may deem fitting for completing the intention of the parties, hut which they, either purposely or unintentionally, have omitted. The former is but the application of a rule of construction to that which is written; the latter adds to the obligation by which the parties have bound themselves, and is of course quite unauthorized, as well as liable to great, practical injustice in the application.” Applying these principles, and looking to the contract, we discover no basis for such an implication as the plaintiff in error asserts.
 

 We are asked to consider the circumstances which at
 
 *113
 
 tended the legislative enactments, and induced them. The State was then in part the owner of an unfinished railroad. It was important to the interests of the people of the State, as well as to the State as a stockholder, that the road should be finished, and to accomplish its completion pecuniary assistance by the State'was needed. For this purpose the State lent her credit. This was the object she had primarily in view. It is said she had also in view her own protection and that of her citizens against loss in so doing, and that it must be presumed the legislature discharged its duty, and made effectual provision for such protection. This is assuming what cannot be conceded. It assumes that it was the duty of the legislature to exact from the company all that could be exacted, and this though the company was in great need of assistance, and though it was the interest of the State that such assistance should be furnished. But if the assumption might be made, it would .«till be inadmissible to deduce an implication of a promise, not from the contract itself, but from the extraneous fact that such a promise ought to have been exacted. Ordinarily a reference to what are called “surrounding circumstances” is allowed for the purpose of ascertaining the subjoct-matter of a contract, or for an explanation of the terms used, not for the purpose of adding a new and distinct.undertaking.
 

 The plaintiff in error further insists that the contract, as exhibited in the acts of the legislature, amounts to an engagement on the part of the company to indemnity the State for the payments she was under obligation to make in discharge of the interest upon her bonds, by means of which the money was raised to pay her subscription to the company’s stock; and as that interest could only be discharged by gold, it is argued the company must be held to have undertaken to pay in gold, since payment by legal tender notes would not amount to indemnity. But we see nothing in the conti'act which justifies its being construed as a contract of indemnity. ’It may be conceded, and it probably was the fact, that both parties thought what the company undertook to pay would suffice to pay the interest upon the State bonds,
 
 *114
 
 from time to time as it should fall due. But nothing in the statutes, read as a whole or read with reference to the required guarantee, or read in the light of the circumstances then existing, exhibits any undertaking that the company’s stipulated payments should suffice to discharge the liabilities of the State. On the contrary there is much in the statutes to repel any possible implication of an engagement to indemnify, and to make it apparent that such an obligation was not intended to be imposed or assumed. As has been noticed, the company was required by the act of 1836 to pay, after the'first three years, six per cent, interest out of the profits of the work, and pay it semi-annually, until the net profits should be adequate to pay a six per cent, dividend, and thereafter pay a perpetual dividend of six per cent
 
 annually.
 
 But the bonds first authorized to be issued by the State to pay her subscription were bonds bearing six per cent, interest payable quarterly, and running not less than fifty years. The commissioners for their sale were also authorized to make the interest on the bonds payable at the loan office of the State, in the city of Baltimore, or at some place or places in Europe, should they find it advantageous so to contract. It is manifest, therefore, that if the bonds had been made payable in Baltimore, principal and interest, the semi-annual payment required of the company would not have met the obligations of the State, which were to pay quarterly her iuterést. And if the bonds had been made payable in Europe, still less would the six per cent, due from the .company, though paid in gold, have enabled the State to pay her interest abroad. In addition she must have paid exchange and the cost of transmission. This seems to indicate clearly that the act of 1836 not only was not, but that it was not intended to create an obligation to indemnify the State. And this is not all. The bonds first issued were .exchanged under the act of 18.39, and sterling bonds bearing five per cent, interest payable semi-annually in London were given to the company in their place. This act required the company to secure the payment of the interest at the rate of five per centum per annum on the stock (the sterling
 
 *115
 
 bonds) created by the act, semi-annually, at least ninety days before the first day of January and July in every year for the term of three years from the date of the bonds or certificates of stock, together with the cost of transmitting the interest to London to be there paid, and also the difieren ce in exchange of currency between London and Baltimore. This was a stipulation for indemnity. It covered all that the State was required to pay as interest on her sterling bonds. But it was expressly limited to the interest for the first three years, and hence it excluded any implication of an obligation to indemnify against all liability of the State to pay the subsequently accruing interest. Unless this is true the limitation to three years is unmeaning. After the expiration of that period, nothing more was required than the semi-annual payment of six per cent, as stipulated by the act of 1836.
 

 It is, we think, also a matter' of some significance that by the contract the payments to the State were required to be made at first out of the profits, the gross receipts of the company. No distinction was made between the kind of money the company might be compelled to receive and that required to be paid to the State. Nor was any distinction attempted to be made between the kind of money with which the dividends to the-State and other stockholders could be paid.
 

 For these reasons, we think, the contract between the parties exhibits no just ground for an implication that the company assumed an obligation to pay its dues to the State in gold, or in any other manner than in money generally, and the fact that the company did pay the Statens interest in sterling funds in London down to 1865, cannot change the construction of the contract.
 

 We do not perceive that the case of
 
 Lane County v. Oregon
 
 has any bearing upon the present controversy.
 

 Judgment affirmed.
 

 Dissenting, Justices CLIFFORD and FIELD.
 

 *
 

 One of tho
 
 Legal
 
 Tender Cases, 12 Wallace, 457.
 

 †
 

 5 Adolphus & Ellis (new series), 671.