Mr. Chief Justice Bingham
delivered the opinion of the Court:
The bill seeks relief in relation to a written contract between the parties. So much of that contract as seems important to be considered now reads as follows:
“ Harvey Spalding, having for several years been engaged in the prosecution of claims of postmasters and late postmasters for adjustment of their salaries in conformity to Section 8 of the Act of June 12, 1886, and having a large number of such claims now in hand, to wit, seventeen hundred or thereabouts, and being now engaged in the prosecution of said claims, and in securing for prosecution other similar claims, of which he expects to secure in the aggregate, including those iii hand, about four thousand in number, more or less, upon agreed fees equal to 25 per cent, of the amount which shall be collected in each case; and having secured the passage by the Senate of Senate Bill 903, this Congress, and the favorable support of House Bill No. 3981 by the proper committee of the House of Representatives, which bills propose a basis for the pettle-' ment of the claims herein referred to, and the substance of which he expects to be enacted into law, and being in need of funds to conduct his said business to completion, hereby *117 agrees to sell the said George Mason one-fourtli of all his interest'in said claims now in hand and all that he may hereafter secure, and one-fourth of all his fees therein, free from all charges for expense of prosecuting said claims to collection thereof, for the sum of twenty-five hundred dollars.
“ The said interest and share in said claims and fees shall vest in said Mason on payment by him of said purchase-money, and a pro rata proportion of said interest and share shall vest in said Mason on payment of each installment of said purchase-money, as hereinafter provided. The said Mason shall pay the said purchase-money to the said Spalding as follows:
“ He shall pay the sum of $100 on signing this contract, and a further sum of $100 on or before the 12th of June instant. .He shall pay a further sum of $300 on or before the 5th day of July proximo, and a further sum of $750 on or before the 5th day of October next. He shall pay a further sum of $600 on or before the; 5th day of November next, and a final payment of $650 on or before the 5th day of December next.
“ It is further agreed that a due proportion of all the powers of attorney and contracts for fees to cover the interest of said Mason shall be transferred to him by said Spalding by proper indorsements of substitution of the powers of attorneys and assignments indorsed upon the contracts, and said fees may be collected by the said Mason, and an account thereof shall be kept, and all the fees collected by the said Spalding shall be accounted for and settlements shall be made from time to time as collections are made, and a division thereof shall be made, three-fourfhs going to said Spalding and one-fourth to said Mason. The said Harvey Spalding agrees and binds himself to obtain all thé claims of the class named he can, and to make contracts for fees equal to 25 per cent, of the collections, and to subject the whole to be shared, together with those in hand, by said George Mason for the consideration hereinbefore specified.
*118 “And the said George Mason agrees and binds himself to pay over to the said Harvey Spalding the whole amount of said sum of $2,500, within the time and in the installments as hereinbefore specified, unless he shall elect to pay the whole of said sum within a shorter period than the time named.”
So much of the answer as is material for us to consider in reference to the questions presented is as follows :
“It is also true that about June 1, 1880, this defendant, being in great need of money for expenses in connection with that business, made application therefor to the complainant. As ground of that application this defendant explained to the complainant his whole business, situation, and prospects in the above relation. Amongst other things he referred to the probability that one or other of two bills then pending in Congress and bearing upon that business would be enacted, to wit, that Senate Bill 903 had already passed the Senate, while House Bill 3981 had received a favorable report from the appropriate committee. At the same time the difference in provision by those bills was discussed, and that Senate Bill 903, which made provision for fewer postmasters than House Bill 3981 did, was, at the same time, from its situation on the calendar, more likely to be enacted. «And this defendant then stated to the complainant that in the course of the nine years for which he had been engaged in that business he had prepared lists of the names of some 7,500 postmasters who, he was satisfied, would, in part or all, be included in the provisions of such bills, and also that of these about 1,700 had already duly authorized him to prosecute such claims as their attorney, with a stipulated compensation equal to 25 per cent, of what should be recovered, whilst he had good ground to believe that in the end he would be so authorized by some 4,000 of these.
“In the course of the same application it was said and understood between the parties that the classes of postmasters *119 included in the bills and previous.legislation would be paid the difference between the amounts of any salary which, during a particular period, they might already have received and the amount of such commissions as, but for legislation in 1864 and after, they would substantially during the same period have received; and it was also then distinctly stated to the complainant by this defendant that it was upon the understanding and theory that the latter had made up the lists aforesaid, as well as had taken the powers of attorney and formed expectations as to the number of clients whom, in the end, he might procure as above stated. ( :
“And this defendant then told the complainant that under the narrower relief of Senate bill 903, which seemed also, as above stated, the more likely of the two to become a law, he estimated that the whole amount of claims that probably he might collect would be -worth about $75,000 and his own fees, consequently, about $18,750, whereas, if House Bill 3981 were enacted those amounts would be, respectively, about $400,000 and $100,000. * * *
“ Further answering, this defendant saith that in administering the Act of March 3,1883, the Postmaster-General, in May, 1883, announced a construction thereof and of the Act of 1866, referred to therein, which contradicted the construction assumed as above by the parties thereto as a basis' of the contract of 1880, and by this defendant in making up the list of 7,500 cases aforesaid. By this construction of the Postmaster-General the 10 per cent, increase mentioned -in said statute did not mean such increase within any one quarter of the year, and therefore did not authorize an addition to compensation either in such 'quarter or in the quarter succeeding that, but meant such increase through a biennial term of quarters, and that.it authorized such additional compensation in any case only for the succeeding biennial term. In February, 1884, this construction was concurred in by the Attorney-General. One effect thereof *120 has been to defeat much the larger part of the 1,700 claims and claimants aforesaid and also much the larger' part of the 4,208. Another effect has been to substitute for this class of defeated claims and claimants a much larger number of others entirely different in title and in person, being such, indeed, as theretofore, so far as this defendant is informed, had not been thought of.”
The contention between the parties as to this part of the case arises upon the construction to be given to the contract. To what claims did this contract relate ? It is claimed by the plaintiff that the contract related to all claims that might be prosecuted by the defendant Spalding arising under the Act of 1866 and any subsequent legislation of Congress, whether under Senate Bill 903. or House Bill 3981, mentioned in the contract, or some other bill that might thereafter be introduced in Congress. It is claimed that the language is comprehensive enough and specific enough to embrace all such claims.
On the part of the defendant it is claimed that the contract had relation to a particular class of claims then within the minds of the parties; that they are partly described in the contract and referred to by the language used in the contract. And it is claimed on the part of the defendant that he should be permitted to show the circumstances surrounding the parties relating t.o the subject-matter at the time of making the contract.
It is claimed by complainant that this would be to alter or change the plain meaning of the contract.
The subject-matter of the contract is 1,700 claims in hand and other similar claims, expected to be sufficient in all to make about 40,000, his interest being in said claims now on hand and all that he might thereafter secure. He agreed to Obtain all the claims of the class named that he could and subject the whole to be shared with the said George Mason.
It is clear from this language that the parties were con *121 tracting with reference to some class of claims understood between themselves. He agrees to sell an interest in all the claims in hand and all similar claims, and then he agrees to obtain all the claims he can of the class named. What claims are- similar to those in hand, and of what class of claims is it that he agrees to procure all that he can?
We think this is a case where it is proper to introduce the circumstances surrounding the parties at the time of contracting, for the purpose not of changing the meaning of the contract or altering it but for the purpose of throwing-light upon the language used and ascertaining the true meaning of the contract. This case is similar in principle to a few cases that have been cited to us and to which we will refer.
“In United States vs. Peck, 102 U. S., 64, it is said: “Parol evidence of the surrounding circumstances is admissible to show the subject-matter of a contract.”
That is the syllabus. The statement of the case is as follows:
“Peck, the claimant, entered into a contract with the proper military officer to furnish and deliver a certain quantity of wood and hay to the military station at Tongue River in the Yellowstone region, on or before a specified day. He furnished the wood, but failed to furnish the hay, which was furnished by other parties at an increased expense. The accounting officers of the Government claimed the right to deduct from the claimant’s wood account the increased cost of the hay. Whether this could lawfully be done w7as the principal question in the cause.
“The court, upon an examination of the contract and of the surrounding circumstances of the case, were of opinion that the contracting parties, in stipulating relating to hay, contemplated hay to be cut in the Yellowstone Valley, and specially at the Big Meadows, near the mouth of Tongue River — which was, indeed, the only hay which the claimant could have procured within hundreds of miles, and which *122 it was known he relied on. The Government officers, fearing that the claimant would not be able to carry out his contract, and it being absolutely necessary that the hay should be had, allowed other parties to cut the hay at Big Meadows and therewith to supply the Tongue River station. The claimant complained of the double injury: first, of giving the hay which he relied on to other parties; and, secondly, of charging him for the increased expense of getting it.”
Mr. Justice Bradley; in delivering the opinion of the court, says:
“We think the facts of the case clearly bring it within the rules allowing the introduction of parol evidence: first, for the purpose of showing by the surrounding circumstances the subject-matter of the contract, namely, hay to be cut and gathered in the region where it was to be delivered.”
He further says:
‘‘That the subject-matter of a contract may be showri by parol evidence of the surrounding circumstances. Bradley vs. Washington, Alexandria and Georgetown Steam Packet Co., 13 Peters, 89; Thorington vs. Smith, 8 Wall., 1; Maryland vs. Railroad Co., 22 Wall., 105; Reed vs. Insurance Co., 95 U. S., 23; 1 Greenl. Ev., Sec. 277; Taylor’s Ev., Sec. 1082.”
It will be noticed that the written contract in this case does not include anything as to the description of what was to be furnished or the place from which it was to be furnished. The court, however, permitted parol evidence to be introduced for the purpose of showing that the parties at the time of making the contract contemplated hay to be cut at the mouth of Tongue River at Big Meadows, to supply the Tongue.River station near the mouth of Tongue River; that this was the only hay that could be furnished at any reasonable expense by the claimant in order to fulfill his contract.
*123 In Heed vs. The Insurance Co., 95 U. S., 23, the syllabus reads thus:
“A policy of insurance on a vessel at and from Honolulu via Baker’s Island to a port of discharge in the United States, contained a clause: 1 The risk to be suspended while vessel is at Baker’s Island loading.’ Held, in view of the circumstances which must be supposed to have appeared to the parties at the time of making the contract, that the meaning of the clause is that the risk wasUo be suspended while the vessel was at Baker’s Island for the purpose of loading, whether actually engaged in the process of loading or not.
“Although a written agreement cannot be varied by proof of circumstances out of which it grew and which surrounded its adoption, they may be resorted to for the purpose of ascertaining its subject-matter and the stand-point of the parties in-relation thereto.”
In this case the vessel insured was lost while in port at Baker’s Island for the purpose of loading, though not actually engaged in loading at the.time of its loss.
Mr. Justice Bradley in this ease says:
“ This case upon the merits depends solely upon the construction to be given to the clause in the policy before referred to, namely, ‘ the risk to be suspended while vessel is at Baker’s Island loading,’ and turns upon the point whether the clause means while the vessel is at Baker’s Island for the purpose of loading, or while it is at said island actually loading. If it means the former, the company is not liable; if the latter, it is liable.
“A strictly literal construction would favor the latter meaning; but a rigid adherence to the letter often leads to erroneous results and misinterprets the meaning of the parties. That such was not the sense in which the parties in this case used the words in question is manifest, we think, from all the circumstances of the case. Although a written agreement cannot be varied (by addition or subtraction) by proof of the circumstances out of which it grew and which surrounded its adoption, yet such circumstances are *124 constantly resorted to for the purpose of ascertaining the subject-matter and the stand-point of the parties in relation thereto. Without some knowledge derived from such evidence, it would be impossible to comprehend the meaning of an instrument or the effect to be given to the words of which it is composed. This preliminary knowledge is as indispensable as that of the language in which the instrument is written. A reference to the actual condition of things at the time as they appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities.”
“On this subject Professor Greenleaf says:
“ ‘ The writing, it is time, may be rea'd by the surrounding circumstances in order more perfectly to understand the intent and meaning of thé parties; but as they have constituted the writing to be the only outward and visible expression of their meaning, no other words are to be added to it or substituted in its stead. The duty of the courts in such cases is to ascertain not what the parties may have secretly intended as contra-distinguished from what their words express, but what is the meaning of the words they have used?’ 1 Greenl. Ev., Sec. 277.”
Again: “The principles announced in these quotations, with the limitations and cautions with which they are accompanied, seem to us indisputable; and, availing ourselves of the light of the surrounding circumstances in this case, 'as they appeared or must be supposed to have appeared to the parties at the time of the making of the contract, we cannot doubt that the meaning of the wrnrds which are presented for our consideration is that the risk was to be suspended while the vessel was at Baker’s Island for the purpose of loading, whether actually engaged in the process of loading or not. Taking this clause, in absolute literality, the risk would be only suspended when loading was actually going on. It would revive at any time after the loading was commenced if it had to be discontinued by stress of weather or any other cause. It would even revive *125 at night when the men were not at work. This could not have been the intent- of the parties. It could not have been what meant, by the words ‘while vessel is at Baker’s Island loading.’ ”
Looking to the surrounding circumstances of this case, we find that the parties discussed a class of claims entirely different from the class of claims which were finally prosecuted by the defendant and the amounts recovered for which he received these fees. He had on hand then, for which he had powers of attorney, some 1,700 claims. He had a list of 7,500 claims under the Act of 1866, which he presumed to be collectible under that act and under subsequent legislation then contemplated. He states to the complainant by written statement, which the evidence substantially shows he did give the complainant at the time of this negotiation, that he supposed there would be from 8,000 to 10,000 claims altogether under the Act of 1866, and of that number he hoped to get, or expected to get, 4,000 himself, having already acquired 1,700. It is stated in this paper that these claims are all .claims in excess of $25.
It appears by the answer, too, that upon the construction which he gave to this Act of 1866 at the time the contract was made, which both parties admit was discussed between them, the act related to compensation due to postmasters prior to the passage of the Act of 1866, and would be recoverable for single quarters where the compensation would be more than the amount which was actually paid to the postmasters. Under a subsequent statute, passed in 1883, by the construction of the Postmaster-General of the act of 1866, as modified by this act of 1883, it was held that the law did not apply to single quarters, but to a series of biennial quarters, and did not apply to compensations which might have been earned by postmasters under the Act of 1854, in accordance with the section of the Act of 1854 as specified in the Act of 1866, to compensations already earned, but applied to compensations that might result for-the benefit of postmasters after the passage of the Act of 1866.
*126 The effect of this was, as is agreed, and as is stated in the pleadings of both parties, to change the class of claims very materially. Many of the persons included in the list of 1,700 which the defendant had at the time of making this contract were excluded by this construction of the Postmaster-General, as well as of'the list of 4,000 which he expected to get, as also of the list of 7,500 which he had upon his books at the time of making this contract.
That being the case, the question arises whether or not it is competent for the defendant in this case to introduce evidence showing the condition of the very subject-matter about which the contract was made, for the purpose of showing to what the parties referred when they spoke of certain claims already obtained, and certain similar claims which they expected would be obtained by the defendant for the prosecution. Was it a general indefinite undertaking on the part of the defendant to procure and prosecute all the claims that he could under the Act of .1866 and any subsequent legislation that might be enacted by Congress? Was it to give to this plaintiff, for the specified sum of $2,500, one-fourth of all that he might obtain thereafter in relation to such claims? Or was it in relation to some definite class of claims which the parties understood at the time and had in mind at the time they made their contract?
We think that the reasonable view favors the latter supposition : That the parties contracted with reference to what they knew or what they supposed they knew — as to claims that they believed had an existence at the time they made their contract rather than to some indenfinite or unknown .class of claims not then in the minds of the contesting parties. We think, therefore, that the parol evidence introduced by the defendant for the. purpose of showing the surrounding circumstances, which was admitted by the court below and to which the plaintiff objected, was properly received and should be considered in construing this contract, not for the purpose of changing its meaning, but to give the true meaning to the language employed by the *127 parties to the contract, and that the ruling of the court below, permitting this evidence to be introduced, and in applying it to the contract, and in holding that this contract related to the claims "then in hand and then listed and referred to and understood to be in existence by the parties at the time of making the contract was right and should be confirmed.
There is some controversy whether the defendant at the time did not exaggerate the number of claims. There is not much question made about that, but the defendant stated the value of the claims to be $2,000,000. It turns out that, under the construction given to the law by the Postmaster-General, the value of these claims was less than seems to have been estimated loosely by the defendant, and the payment of which was made subject of consideration by the plaintiff at the time of the negotiation, and that the gross amount of the fees was somewhat less; but this is not an action for fraudulent representations. It is an action to recover what the plaintiff claims is due to him upon the contract, and the purpose now is to ascertain the real contract obligation. There may be some controversy between the parties as to the surrounding circumstances, but the material facts that the parties discussed the claims on hand and the quantity of claims that would probably be procured and the sort of claims that would be prosecuted under the Act of 1866, with the added legislation then expected by the passage of either the Senate or House bill mentioned in the contract are proved beyond question.
Did the parties contract with reference to something they talked about as existing, or was it an indefinite or general contract to compel the defendant to prosecute all claims that might arise under the Act of 1866 and any subsequent legislation of Congress with any construction that might be given to that legislation by the Executive Department? We think not. We think that it is immaterial ; that there may be some variance between these two *128 parties, who testify as to some of the circumstances occurring at the time of the negotiations between them. It is agreed, however, that these things were discussed, and the parties do agree, not only in their testimony, but in their pleading, that the construction given to this legislation by the Postmaster-General in 1883, and the Attorney-General in 1884, was never contemplated or considered or thought of by either of the parties until about the time that construction was made; and they do agree, both in their testimony and in their pleadings, that this construction made a very material change. By that construction many of the claims which they had anticipated were wiped out, and a much greater number of claims, less in value, were substituted and of a different character and for a different cause and for a different time, and embracing to a very considerable extent different persons from those embraced in the claims which were under contemplation by the parties at the time of making their contract.
There is another question in the case. It appears that some time after the making of this contract and after the defeat of the Senate bill and the adjournment of Congress without passing the House bill mentioned in the contract the defendant became disheartened, according to the averment of the plaintiff himself in his plea, and was proposing to give up all further efforts in relation to the matter, but was encouraged by the plaintiff to persevere upon a promise on his part to pay one-half of all the expenses after that time in regard to such prosecution, the original agreement being that he was to pay $2,500 and not to be chargeable with any expenses beyond that sum. The defendant says that, in consideration of this promise on his part, he agreed to continue his efforts to procure the needed legislation. Perhaps it should be mentioned that, by reason of time having elapsed as to the postmasters in office at the time of the passage of this Act of 1866, at the time these salaries were earned by postmasters the law was no longer in con *129 dition to be executed without further legislation. Therefore it became necessary that there should be a further act of Congress; and in 1882 this defendant agreed, as he says in his answer, in consideration that the plaintiff pay half of the expense, to continue his efforts to get the needed legislation. •
The court below found against the defendant on this part of his answer. He alleges that the expenses were very heavy, amounting to something like $60,000; that the complainant was liable to pay one-half of these expenses. But the court below found against the position of the defendant in this particular; but found for the defendant as to the construction in regard to the class of claims embraced in the contract.
From this decree of the court below the complainant appealed. The defendant did not -appeal from the decree against him in reference to the costs of the prosecution of these claims. No cross-bill was filed.
While this matter has been the subject of considerable argument between counsel orally and in their briefs, it is conceded by counsel for the defendant, the appellee, that if the court affirms the decree of the court below as to findings upon the question of what is embraced within the contract of the parties, as to that part of it which is against the complainant and from which he appeals — if they affirm that, then the court must affirm the decree in toto, inasmuch as the defendant has not appealed from that part of the decree which is against himself. He only claims that part of the decree might be modified and reversed upon the appeal of the defendant.
Inasmuch, then, as we affirm the decree of the court below, from which the complainant appeals, the decree will be necessarily affirmed in tolo. We cannot recognize the right of the defendant to have this matter reviewed when it was not appealed. There is nothing for us. to'decide.
The decree of the court below will be affirmed.