## SHIPMAN v. SALTSBURG COAL CO.

(Circuit Court of Appeals, Third Circuit. June 15, 1894.)

SALE—APPORTIONMENT OF DELIVERIES.

A contract for the sale of the entire output of certain coal mines, at prices payable in monthly installments, for the coal at the mines, the buyer agreeing to ship and pay for at least a certain quantity per annum, provided so much is furnished him, cannot be construed, because of circumstances existing when it was made, to require him to take the coal monthly, in such quantities as to keep the seller's works and workmen reasonably employed, as they had customarily been and were at the time of the contract, thus imposing on him a distinct and unexpressed obligation.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

This was an action by O. W. Shipman against the Saltsburg Coal Company, for damages for breach of contract. On the trial in the circuit court the jury found for defendant, and judgment for defendant was entered on the verdict. Plaintiff brought error.

R. L. Ashhurst and S. S. Hollingsworth, for plaintiff in error.

Wm. M. Stewart, Jr., and George L. Crawford, for defendant in error.

Before ACHESON, Circuit Judge, and WALES and GREEN, District Judges.

ACHESON, Circuit Judge. This was an action brought by O. W. Shipman against the Saltsburg Coal Company for the breach of a written agreement between these parties, dated September 30, 1889, the material provisions of which are these:

"That the said the Saltsburg Coal Company agrees to sell, and the said O. W. Shipman agrees to purchase, the entire output of the Foster and Fairbank coal mines, except as hereinafter provided, for a period of five years, beginning from the first day of January, A. D. 1890, at the following prices, payable in monthly installments, on or before the twelfth day of each and every month during the term."

After specifying the prices, the paper provides:

"The above prices to be paid for the coal free on board at the mines, and all freights on shipments to be paid by the said O. W. Shipman."

Here follows a clause excepting coal to supply local demand, and a provision for an advance in the specified prices in the event of an increase in the cost of mining. The paper then proceeds as follows:

"And the said O. W. Shipman covenants and agrees to ship and pay for at least two hundred thousand tons of coal per annum, provided that so much is furnished him, and the shipment of the same is not prevented by storms, strikes, or railroad complications over which he has no control. In case default be made by either party in any of the covenants of this contract for a period of thirty days, the other party shall have the option, upon giving a ten-days written notice thereof, to cancel this agreement, and hold the other party liable for all damages caused by reason of such failure to comply with the covenants herein contained."

Shipment of coal began January 1, 1890, and ceased August 13, 1891, the defendant company having given notice on the latter date that it canceled the agreement because of the alleged default of the plaintiff. During the year 1890 the shipments of coal under the contract amounted to 220,731 tons, in unequal monthly quantities; the highest monthly shipment being 21,725 tons, and the lowest 14,830 tons. In the year 1891 the shipments in the month of January were 17,942 tons; in February, 11,919 tons; in March, 19,431 tons; in April, 10,775 tons; and in May, 10,744 tons. In June the shipments fell to 8,319 tons, and in July to 8,010 tons. In August the plaintiff shipped 5,270 tons. To these shipments in the year, 1891, however, is to be added the item of 11,310 tons of "tipple coal," so that the total amount taken by the plaintiff in 1891, up to the termination of the contract by the act of the defendant, was 103,720 tons. The unvarying course of dealings between the parties, under the contract, was for the plaintiff to give the defendant orders for coal, and the coal was mined by the defendant when and as these orders were received. It does not appear that the defendant, in any instance, mined coal, and tendered it to the plaintiff, or notified him to ship it. After the 1st day of April, 1891, the defendant complained of the falling off in the plaintiff's shipments, and repeatedly asked him to increase his orders. On August 13, 1891, the defendant served upon the plaintiff a written notice, addressed to him, and signed by the president of the coal company, of which the following is a copy:

"You are hereby notified by the Saltsburg Coal Company that, under the terms of your written agreement with said company, you have failed to comply with the same by shipping and paying for at least two hundred thousand tons of coal per annum, together with other matters connected with said agreement. You are also notified that more than thirty days have expired since you have failed and refused to comply with said contract; and, in accordance with its terms, the said company hereby further notifies you that at the expiration of ten days from this date, that said company, under its option, cancels the agreement between you and said company, and that said company will hold you responsible for all damages caused by reason of said failure."

The defendant declined to furnish any coal under the contract subsequently. The alleged reason (and it would seem, from the evidence, the true reason) for the falling off in the plaintiff's shipments was an excessive increase in the freight rate on this coal (an additional charge of 40 cents a ton), which the Pennsylvania Railroad

Company imposed in the spring of 1891. That company operated the only railway connecting with these mines, and this advance in freight charges seriously interfered with the plaintiff's established trade. There was uncontradicted evidence to show that the defendant company, with its then facilities, could mine over 300,000 tons of coal a year. In the court below the defendant took the position that the plaintiff was bound to take 200,000 tons of coal per annum, in equal monthly quantities. But the court declined—and, we think, rightly—so to construe the contract. The court here said:

"The demand for coal on the plaintiff, who was selling, might be greater during one month, or one season, than another; and in the absence of any language requiring him to take an equal amount each month it would be unreasonable to suppose that he was intended to do so."

The court, however, added that it—

"Would be equally, if not more, unreasonable to conclude that he was intended to take, if he saw fit, only a nominal amount for one month, or for several months, in compliance with the mere letter of the contract, and thus leave the defendant without employment for its men or its works during this period, and force it to the serious disadvantage of furnishing the balance of the usual output of 200,000 tons during the limited period of the year left."

The court said that the paper was to be read in the light of the circumstances surrounding the parties at the time it was executed, which circumstances, it was stated, were—

"That the plaintiff was purchasing the coal to sell again, as he could obtain purchasers; that the defendant, the coal company, was operating mines which produced, as then and previously worked, about 200,000 tons per annum, and that there was no provision on the premises for storing coal; that the practice was at the time of the contract, and had been, to take it from the mines, and load it on cars as mined, which cars the railroad company would not permit to remain standing upon its tracks longer than was necessary to make up trains and get them away after being loaded; and that the plaintiff, or his agent who negotiated the contract, was familiar with the mines, understood their situation, and the extent of their output."

The learned judge gave the jury the following instructions, which are assigned for error:

"I therefore charge you that it was the plaintiff's duty to take the coal monthly, in such quantities as was sufficient to keep the defendant's works and workmen reasonably employed, as they had customarily been, and were at the time of the contract, and as would have enabled the defendant to furnish, and the plaintiff to take and pay for, the 200,000 tons during the year. * * * Now, the question of fact for your determination is whether or not the plaintiff did, during the months of June, July, and August, take as much coal as I have already said it was his duty to accept. Did he take as much as was necessary to keep the defendant's works and workmen reasonably employed, according to its usual custom, and as was necessary to enable the defendant, without unreasonable crowding or increased expenditure, to furnish, and the plaintiff to accept, the balance necessary to make up 200,000 tons within the year? You have heard the evidence about the closing of one of the mines, and the idleness and discharge of men, or their withdrawal, from the other mine. If this is true, and if such closing of one of the mines, and idleness, discharge, or withdrawal of men from the other, resulted, alone and directly, from the plaintiff's failure to take more coal than he did during the period referred to, and if this contracting of the work was an unusual occurrence in the prosecution of the defendant's business, it would seem to follow, necessarily, that the plaintiff failed in his duty, and that the defendant was justified in annulling the contract."

We are unable to concur in the views expressed in these instructions. The written agreement contains no provision requiring Shipman to take the coal in such monthly quantities as may be sufficient to keep the coal company's works and workmen reasonably employed, as they had customarily been, and were at the time the contract was made, and we find no warrant for importing into the contract such an undertaking. If the parties had intended this to be the measure of Shipman's duty, nothing was easier than to say so. The absence from the paper of such a provision is a conclusive reason against the interpolation thereof by judicial interpretation. It will be perceived that the coal company was under no correlative obligation. It did not covenant to keep its mines or workmen employed as they were at the date of the agreement, or as they had customarily been employed. Nor, indeed, did it covenant to keep them employed at all. Had the company seen fit to suspend mining, it would not have violated its engagement with the plaintiff. What the plaintiff expressly stipulated to do was "to ship and pay for at least two hundred thousand tons of coal per annum," provided so much was furnished him. To hold that he also bound himself to take the coal in reasonably apportioned monthly quantities, so as to keep the defendant's mines in constant operation, as they were at the date of the contract, and had been previously, is to impose upon him a distinct and unexpressed obligation. Nor is there any covenant on his part from which any such implication can properly arise. In Maryland v. Railroad Co., 22 Wall. 105, 113, the supreme court of the United States declared:

"Ordinarily, a reference to what are called 'surrounding circumstances' is allowed, for the purpose of ascertaining the subject-matter of a contract, or for an explanation of the terms used,—not for the purpose of adding a new and distinct undertaking."

And in Brawley v. U. S., 96 U. S. 168, 173, we find the rule thus laid down:

"Previous and contemporary transactions and facts may be very properly taken into consideration to ascertain the subject-matter of a contract, and the sense in which the parties may have used particular terms, but not to alter or modify the plain language which they have used."

In the former of these cited cases, Mr. Justice Strong, speaking for the court, quotes with approval, as based on "sound reason," the remarks of Lord Denman, who, delivering the judgment of the queen's bench in Aspdin v. Austin, 5 Adol. & El. (N. S.) 671, said:

"Where parties have entered into written engagements, with express stipulations, it is manifestly not desirable to extend them by any implications. The presumption is that, having expressed some, they expressed all the conditions by which they intended to be bound under that instrument. It is possible that each party to the present instrument may have contracted on the supposition that the business would in fact be carried on, and the service in fact continued, during the three years, and yet neither party might have been willing to bind themselves to that effect; and it is one thing for the court to effectuate the intention of the parties to the extent to which they may have, even imperfectly, expressed themselves, and another to add to the instrument all such covenants as, upon a full consideration, the court may deem fitting for completing the intention of the parties, but which they, either purposely or unintentionally, have omitted. The former is but the application of a rule of construction to that which is written. The latter adds

to the obligation by which the parties have bound themselves, and is, of course, quite unauthorized, as well as liable to great practical injustice in the application."

These observations, here so pertinent, commend themselves to our judgment. Applying, then, to this case, the principles sanctioned by the foregoing authorities, we are constrained to hold that the above-quoted instructions, of which complaint is here made, were unwarranted and erroneous.

To the suggestion that during the first year the contract was in force the defendant's mines were kept running without any serious interruption, it is enough to say that no determining effect is to be given to that fact, the language of the plaintiff's stipulation being clear. The judgment of the circuit court is reversed, and the case is remanded for a new trial.