JOHNSON vs. NORTHWESTERN NATIONAL INSURANCE COMPANY.

MARINE INSURANCE. *(1, 2) Construction of phrase, " Loading offshore prohibited," in marine policy. (5) Rule of construction.*

EVIDENCE. *(3, 4) Extent to which parol evidence admissible to explain a policy of marine insurance.*

1. The words, " Loading offshore prohibited," in a policy of marine insurance, are capable of being construed by the court without the aid of extrinsic evidence; and where the plaintiff puts such a policy in evidence in an action thereon, without extrinsic evidence of its meaning, there is no error in denying a nonsuit on that ground.

2. In the absence of extrinsic evidence, this court would construe such words

as merely intended to prohibit loading while the vessel was lying at anchor away from the shore, and not to prohibit loading at a bridge pier.

3. In an action on such a policy, parol evidence of experts is admissible to show that the words "loading offshore" have acquired a certain definite and notorious meaning among nautical men, and that they include loading at a bridge pier.

4. If adopted by the underwriter in a nautical sense, such words will be presumed to have been taken with their known signification in maritime matters, and the testimony as to their meaning cannot be confined to their use in policies of insurance.

5. To instruct the jury that if the term "offshore" may be understood in more senses than one, it is to be interpreted "in the sense in which defendant had reason to suppose plaintiff understood it," would be error.

APPEAL from the County Court of *Milwaukee* County.

Action on a policy of marine insurance. Verdict for the plaintiff, and judgment thereon, from which the defendant appealed.

The facts sufficiently appear in the opinion.

*L. S. Dixon*, for appellant, among other points, argued, 1. That the motion for a nonsuit should have been granted, because, if the words used in the policy were of doubtful meaning, so as to make parol evidence admissible to explain them, it was incumbent upon the party offering the instrument to produce such evidence, that it might be known what, if any, his rights were; and if the words are capable of construction without the aid of extrinsic evidence, then, taken in their primary grammatical sense, they would include in their prohibition the loading of a vessel at the end of a bridge pier, fifteen hundred feet from shore.  2. That in the absence of any evidence that defendant had knowledge or information of the interpretation claimed and put upon the policy by plaintiff, it was error to instruct the jury that "if the phrase might be understood in more senses than one, it was to be interpreted in the sense in which the defendant had reason to suppose the plaintiff understood it."  3. That the question in the case was as to the meaning of the words "loading offshore" in an insurance policy, and not as to their meaning in a charter party

or other maritime contract, and the testimony should have been confined to that issue. *Coit v. Ins. Co.*, 7 Johns., 385; *Cobb v. Ins. Co.*, 58 Me., 326; 1 Pars. M. Ins., 83; *Smith v. Wilson*, 3 Barn. & Ad., 728; *Hinton v. Locke*, 5 Hill, 437.

*James G. Jenkins*, for respondent :

1. The phrase "loading offshore" having no known legal signification, it was essential that its meaning should be resolved in the light of known usage; and the question was for the jury, to be determined upon the evidence. *Am. Ins. Co. v. Bryan*, 26 Wend., 581 ; *Sleght v. Rhinelander*, 2 Johns., 531; *Coit v. Ins. Co.*, 7 id., 385; *Dow v. Whetten*, 8 Wend., 160; *Ganson v. Madigan*, 15 Wis., 144; 2 Parsons on Con., 67; Phillips on Ins., pl. 142–4, 1943; *Eaton v. Smith*, 20 Pick., 150; *Ex parte Hall*, 1 id., 262. 2. In case of a loss the underwriter is *prima facie* responsible, and the burden of proof is with him to show that it is not within the terms of the policy. *Williams v. East India Co.*, 3 East, 192; *Am. Ins. Co. v. Bryan, supra*. 3. Ambiguous or doubtful terms are to be taken most strongly against the person using them. Metcalf on Con., 312. 4. Underwriters using technical words in their policies, are bound to know the technical meaning of the terms used, and are liable according to that meaning. 1 Phillips on Ins., ch. 1, § 13; *Astor v. Ins. Co.*, 7 Cow., 202; *Noble v. Kennoway*, Doug., 511. Having adopted a nautical term into its policy, the defendant must be held to have taken it with the known signification attached to it in maritime matters, and cannot give to it a different signification.

COLE, J. This is an action on a marine policy of insurance issued by the defendant upon a schooner, the property of the plaintiff. The vessel was lost while taking in a load of wood at a bridge pier near Bayley's Harbor on the west shore of Lake Michigan. The policy had printed on the margin the words, "Loading offshore prohibited." The important question in the case is in regard to the meaning of these words in the

policy, and as to whether they did or did not prohibit loading at a bridge pier.

The plaintiff introduced the policy in evidence, proved the time and circumstance attending the loss of the vessel, and then rested, without offering any proof, or making any explanation, of the meaning of the prohibitory clause, or to what act it applied. The defendant moved for a nonsuit, which was overruled. The first exception relied on for a reversal of the judgment is the one taken to this ruling of the court refusing to grant the nonsuit.

On this point the learned counsel for the defendant assumes, as the basis of his argument, that the words in question are of doubtful signification, so much so that it was impossible for the court, looking on the face of the instrument, to ascertain their sense and meaning, and give them application; and consequently that parol evidence was necessary to render them intelligible. This being the case, it is insisted that it was incumbent on the plaintiff, offering the policy in evidence and seeking to recover upon it, to show what the words meant, and to establish the fact that they did not include loading at a bridge pier.

There would certainly be conclusive force in this reasoning if the assumption were sound that the phrase "loading offshore" was so obscure or unintelligible that the court, without the aid of extrinsic evidence, was unable to give it any meaning or place any rational construction upon it as used in the contract; but such, it seems to us, is not the case. On the contrary, it is possible to construe the language and give the words an interpretation, without any explanation or aid from parol testimony. And, giving to the language used its common and apparent meaning, we should say that the clause in question was only intended to prohibit loading at a distance from and away from the shore while the vessel was lying at anchor, and that it did not include loading at a bridge pier. A bridge pier is really a projecting wharf, is a permanent

structure attached to and firmly connected with the main land; and loading from such a place one would naturally suppose was like taking in a cargo from shore. If the words are not used in a nautical sense in the contract, and have not a technical meaning, this is the construction we should place upon them. Certainly the words are not so obscure or ambiguous that they are unintelligible without the aid of parol testimony. We should not understand — in the absence of all testimony that custom or usage in marine contracts had attached to them a different meaning — that they did include or were intended to be applied to the case of loading at a bridge pier. It may be true, as claimed by defendant's counsel, that in a certain sense loading at the end of a bridge pier fifteen hundred feet long is loading " offshore;" or away from and distant from the main land; but it is apparent that it is loading under quite different conditions from a vessel taking in a cargo from rafts and barges while anchored offshore, which manner of loading we think the company intended to and did in fact prohibit. So that we are unable to agree with counsel in the position, that the words in the policy are of such doubtful import that it was impossible for the court, in reading the instrument, to discover their meaning, or give them proper application. Nor do we think it correct to say that in their natural, ordinary sense they do include loading at a bridge pier, so as to make it necessary for the plaintiff in the first instance to explain the words, and to show by evidence that the loss did not come within the prohibitory clause. *Prima facie* the company was liable for the loss, unless it was made to appear that by custom or usage the words in a nautical or technical sense did include loading at a bridge pier, and that such a meaning must be given them in the policy.

It was claimed on the part of the defendant, that, by well established custom or usage, the phrase " loading offshore," when used in maritime contracts, more especially when inserted in a marine policy of insurance, included any manner of

loading outside a harbor, and included taking a cargo from a bridge pier, as well as from scows and rafts while the vessel was at anchor; and that the words must be understood in that sense in this contract. And, in support of that construction, several witnesses, seafaring men, were examined on the trial as to the meaning of the term "loading offshore" in nautical language and as used and understood by seamen and persons engaged in the navigation of the lakes. And these witnesses testified that the words meant loading from a pier, or scow or raft, or, in other words, loading outside a harbor. But on the other hand the plaintiff produced a still greater number of witnesses, seafaring men, who testified to the general understanding of the term among seamen, and that in a nautical sense it did not include loading from a bridge pier. The testimony is quite strong that in contracts of affreightment and charter parties the words do not apply to pier loading; but there is more doubt or conflict as to what is understood by them among insurers and vessel owners. In various ways the question is raised upon the record, to what extent parol evidence may be received to affect the construction of the policy and give a meaning to the words in question. The counsel for the defendant contends that no evidence relating to the meaning of the doubtful words was admissible except what tended to show their signification as used in policies of insurance and between underwriters and insured. But the court below made no distinction between the use of the words in insurance policies and other marine contracts, holding that the term was a nautical one, and that the jury must determine, from all the evidence bearing upon the subject, what "loading offshore" meant among nautical men and as used in the policy. We do not deem it necessary to comment at length upon the charge of the court, nor to specifically notice the exceptions taken to the refusal of the court to strike out certain testimony, and to other rulings made on the trial. Our views upon some of these exceptions will be gathered

from the remarks which will be made upon the case, and upon one portion of the charge which we deem erroneous and well calculated to mislead the jury to the prejudice of the defendant.

"It sometimes happens," says Prof. Parsons in his work on Marine Insurance (vol. 1, p. 77 et seq.), "that the words used have a peculiar commercial meaning, and then the reason of their use, or of any provision respecting them, may assist in ascertaining that meaning. Or they may be technical words of a trade or business; for there may be in this instrument [a marine policy] as in any other, words peculiar to a certain act or occupation. Such words occur most frequently in instruments respecting machinery and the like, but they may occur in any instrument, and wherever they occur, witnesses who are experts may be called to give their meaning." "Experts," he observes, "are very frequently called in insurance cases, but generally in relation to the condition or character of the vessel, or other facts in the case. They may, however, be called in reference to the construction of a policy, if technical words, as we have already defined them, appear in it. * * * In the construction of all contracts it is indeed a rule which is founded on obvious justice and reason, that if words are used which are peculiar to the subject matter of that contract, and when so used have a meaning which is well, widely and long known, the parties must be presumed to have used those words with that meaning." p. 81. And the learned author cites in the notes to the text a great many authorities in support of the rule that, "where terms are used which are known and understood by a particular class of persons in a certain special and peculiar sense, evidence to that effect is admissible for the purpose of applying the instrument to its proper subject matter."

Within this rule it was certainly competent and proper for the court to receive the testimony introduced on the trial for the purpose of ascertaining the true meaning of the particu-

lar words used in the policy. And the court was right in submitting to the jury the question, notwithstanding the ordinary sense which would be given to the words "loading offshore" as we have indicated, whether or not in nautical language and among nautical men they had acquired a certain, definite and notorious meaning, which prohibited loading at a bridge pier. If the jury determined that the phrase was a nautical one, and by usage and custom had such a meaning among nautical men, then they were directed to find for defendant. But if, on the contrary, they found that the words meant simply to prohibit loading at anchor, and not from bridge piers, then the court instructed that the plaintiff was entitled to recover. But the counsel for the defendant insists that the parol testimony should be confined to that which shows the meaning of the words in policies of insurance. It seems to us the testimony cannot be thus restricted. If the words have a clear, definite and well known meaning in maritime language, they must have that signification in all maritime contracts. It would be utterly inadmissible to show that the words had one meaning in a contract of affreightment, another in a charter party, and a still different meaning in a policy of insurance; or rather this would show that they really had no precise, well defined and notorious sense in nautical language. If the underwriter adopted the term as a nautical one, it must be presumed that he took it with the known signification attached to it in maritime matters. Upon these questions, therefore, we think the court properly instructed the jury as to the law of the case.

But the court further told the jury that if the phrase may be understood in more senses than one, it was to be interpreted in the sense in which the defendant had reason to suppose the plaintiff understood it. Under this instruction it is obvious the jury might have found that "loading offshore," in the sense in which nautical men would understand the term, prohibited loading off a pier, but that this was not the sense in

which the defendant had reason to suppose the plaintiff understood it, and therefore have rendered a verdict in his favor. In a nautical sense the meaning of the term might be well defined and widely known. But, from the size of the vessel and circumstances attending the issuing of the policy, the insurer might have reason to suppose the insured understood the clause in a wrong sense, and was mistaken as to its true meaning. In that case, was the insurer bound to make good the loss, though not fairly covered by the policy, because he failed to correct the mistake of the party with whom he was dealing? According to the instruction he was responsible. Prof. Parsons, in his work already cited, alludes to this question (p. 74), and suggests a doubt whether an answer to it which may be good in a moral point of view, expresses a principle from which a legal rule of construction can be extracted. He shows that the rule is derived from Dr. Paley, whose remarks on the subject, he observes, have been often quoted in legal as well as other works, to the effect " that that meaning is not always obligatory which the promiser actually held, because the promisee might not know that the promiser so meant; nor is it always the meaning which the promisee actually gave to the promise, because the promiser might not have intended the meaning, nor justified the promisee in so understanding it." And Paley adds that "the promise must therefore be obligatory in the sense in which the promiser believed that the promisee accepted his promise." Prof. Parsons thinks that this cannot be a safe and sufficient rule for legal construction, except with the qualification, " and the promiser used words which can be rationally construed as expressing the sense which the promisee attached to them." It seems to us the rule is only sound in law with such a material qualification.

In the case of *Morse v. Buffalo Fire & Marine Ins. Co.*, 30 Wis., 534–539, Mr. Justice Lyon, *arguendo*, refers approvingly to this rule, and thinks it might well be applied in the

construction of policies of insurance; but the point was not really one upon which the judgment turned, and therefore cannot be considered as one definitely determined. The rule, as laid down by Paley, is doubtless sustained by the remarks of the judges who gave the opinions in *Potter v. The Ontario & Livingston Mut. Ins. Co.*, 5 Hill, 147–149; *Barlow v. Scott*, 24 N. Y., 40–42; and *Hoffman v. Ætna Ins. Co.*, 32 id., 405–413; but we do not think it has become a legal rule in the construction of contracts. "The question in this and other cases of construction of written instruments, is not what was the intention of the parties, but what is the meaning of the words they have used." DENMAN, C. J., in *Rickman v. Carstairs*, 5 B. & Ad., 651–663. But, without dwelling longer upon the case, we think there must be a new trial for the error in the charge above quoted.

*By the Court.*—The judgment of the county court is reversed, and a new trial ordered.