In re SOUTHERN PAC. CO. et al.

(Circuit Court, N. D. California. August 12, 1907.)

No. 14,269.

1. ARBITRATION AND AWARD—CONSTRUCTION OF ARBITRATION AGREEMENT—SCOPE OF QUESTIONS SUBMITTED.

An agreement for arbitration between a railroad company and the Order of Railway Telegraphers, under Act June 1, 1898, c. 370, 30 Stat. 424 [U. S. Comp. St. 1901, p. 3205], providing for arbitration of differences between interstate carriers and their employés, provided for the submission, among others, of the question "whether members of the order of railroad telegraphers in the employ of the employer shall legislate for train dispatchers respecting rates of pay and hours of service or otherwise." *Held*, that such question was not limited to an inquiry as to whether the train dispatchers in the service of the employer had authorized the order or its committee to represent them in the arbitration proceedings, which was merely a matter of agency, but that it covered the broader question, as to whether they should be represented generally in their negotiations and dealings with the employer in respect to rates of pay and hours of service by the body of its employés who were members of the order, or should be separately represented, and that the board of arbitration properly admitted evidence offered by the employer to show the nature of their duties, and that their relation to the employer and to its service to the public was different from that of ordinary telegraphers.

2. SAME—ARBITRATION OF LABOR DISPUTES—FEDERAL STATUTE.

An arbitration of differences between an interstate carrier and its employés, under Act June 1, 1898, c. 370, 30 Stat. 424 [U. S. Comp. St. 1901, p. 3205], is essentially a common-law arbitration, and rests solely on the written agreement of arbitration entered into by the parties, which limits and determines, not only the rights of the parties thereto, but also the extent of the powers of the arbitrators, and it is to be construed in accordance with the rules governing the construction of contracts, rather than those applicable to pleadings.

3. SAME—CONSTRUCTION OF AGREEMENT.

A written contract inter partes, as an agreement for arbitration stating the questions to be submitted and determined, must primarily be interpreted by its language taken in its ordinary and accepted meaning, and, if that language is plain and unambiguous in itself, there is no room for construction, but it will be held to mean precisely what its terms imply. It is only when the language is susceptible of more than one construction that the intent or understanding of the parties may be inquired into, or that evidence of the surrounding circumstances may be resorted to.

4. SAME—SCOPE OF QUESTIONS SUBMITTED.

An agreement for arbitration, under Act June 1, 1898, c. 370, 30 Stat. 424 [U. S. Comp. St. 1901, p. 3205], between a railroad company and the Order of Railroad Telegraphers whose members employed by the company were working under a schedule agreed to between the parties fixing rates of pay and hours of service, which submitted as one of the questions to be arbitrated "the question of eliminating from the operation of the schedule certain important agencies where the duties of soliciting traffic are paramount," is not ambiguous in respect to such question, which is clearly limited by terms to "agencies where the duties of soliciting traffic are paramount," and cannot be broadened by construction to authorize the board of arbitrators to consider and determine whether the schedule shall apply generally to "station agents whose regular duties do not include telegraphic work and whose annual earnings * * * equal or exceed" a certain sum.

**5. SAME—ENTRY OF JUDGMENT ON AWARD.**

In an arbitration proceeding to settle differences between an interstate carrier and its employés, under Act June 1, 1898, c. 370, 30 Stat. 424 [U. S. Comp. St. 1901, p. 3205], which provides in section 4 for a hearing by the Circuit Court on exceptions to the award, and also for an appeal from the court's decision within 10 days, judgment on the award cannot be entered by the court until after the appeal has been determined, or until after the time for taking an appeal has expired.

On Exceptions to Award of Arbitrators.

A. A. Moore, Stanley Moore, and O. D. Richardson, for Southern Pacific Co.

Herman G. Walker, for the Order of Railroad Telegraphers.

VAN FLEET, District Judge. This is a proceeding in arbitration between the above-named parties, had in pursuance of the provisions of an act of Congress entitled "An act concerning carriers engaged in interstate commerce and their employés," approved June 1, 1898 (chapter 370, 30 Stat. 424, et seq. [U. S. Comp. St. 1901, p. 3205]), commonly called the "Erdman Act." The proceeding was initiated by a formal contract or agreement entered into between the parties at the city of San Francisco on the 14th day of February, 1907, providing for a board of arbitration to be appointed in conformity with the act to hear and determine the controversy, and which contract, with other matters not necessary to recite, sets forth in exact and precise terms the questions or issues to be submitted to such board. In this contract, as in the act, the railroad company is designated and referred to as the "employer" and the order of telegraphers as the "employés"; and, for convenience, those designations will be hereafter employed in this opinion.

The contract provides that there shall be submitted to the board of arbitration therein provided for four several questions or issues, as constituting the subject of inquiry and adjudication, and those issues are thus stated:

"The questions submitted to arbitration are: (a) Whether members of the Order of Railroad Telegraphers, in the employ of the employer shall legislate for train dispatchers, respecting rates of pay and hours of service, or otherwise. (b) The question of reduction of hours of service on Sundays for employés. (c) The question of percentage and general increase in salaries of employés. (d) The question of eliminating from the operation of the schedule certain important agencies where the duties of soliciting traffic are paramount."

Upon these issues a hearing was had and a large amount of evidence taken, covering over 1,500 pages in typewriting and a great volume of exhibits, and the board thereafter, in due time, answering the questions propounded in the order in which they are above set forth, found and awarded:

"(a) That the members of the Order of Railroad Telegraphers in the employ of the employer shall not legislate for train dispatchers regarding rates of pay and hours of service or otherwise.

"(b) That the regular hours of service on Sundays shall be one-half the regular hours of labor on other days, provided that at any station, where it is impracticable or inconvenient for the employer to arrange the service so as to reduce Sunday labor to one-half time, he may arrange to give the employés

leave of absence and full pay for 26 days per annum, at such time or times as will cause the employer and the public the least inconvenience.

"(c) That the percentage of general increase in salaries of employés shall be seven and one-half (7½) per cent., and that the apportionment of this general increase among divisions and subdivisions of the employer's lines shall be such as may be mutually agreed upon by the employer and the Order of Railroad Telegraphers.

"(d) That the appointment of station agents whose regular duties do not include telegraphic work, and whose annual earnings in the form of salaries and commissions equal or exceed $1,300, shall not be controlled by the schedule or agreement between the employer and the Order of Railroad Telegraphers."

The act provides (section 3, subd. 2):

"That the award and the papers and proceedings, including the testimony relating thereto, certified under the hands of the arbitrators, and which shall have the force and effect of a bill of exceptions, shall be filed in the clerk's office of the Circuit Court of the United States for the district wherein the controversy arises or the arbitration is entered into, and shall be final and conclusive upon both parties, unless set aside for error of law apparent on the record."

In accordance with that provision, the record therein designated, duly certified as required by the act, was filed in the clerk's office of this court on April 6, 1907.

The act further provides (section 4, par. 1):

"The award being filed in the clerk's office of a Circuit Court of the United States, as hereinbefore provided, shall go into practical operation and judgment shall be entered thereon accordingly at the expiration of ten days from such filing unless within such ten days either party shall file exceptions thereto for matter of law apparent upon the record, in which case said award shall go into practical operation and judgment be entered accordingly when such exceptions shall have been finally disposed of, either by said court or on appeal therefrom."

In pursuance of this last provision, the employés, through their counsel, on April 16, 1907, filed in this court exceptions to the finding and award of the board of arbitration made in response to issues A and D. The specifications against finding A are that the award is contrary to law, that it is not supported by the evidence, and that the board erred in the admission of any evidence under said issue, except evidence as to train dispatchers in the employ of the employer being members of the order of employés, and evidence as to the authority given by a majority of the train dispatchers to employés to represent them in legislating with employer respecting rates of pay, hours of service, and otherwise, as stated in said clause A. The specifications against finding D are that the award is contrary to law; that it is not supported by the evidence; that the board erred in admitting evidence pertaining to matters outside of and not responsive to the questions submitted under said issue; and, lastly, that the finding is not responsive to the question submitted by the agreement of arbitration, but attempts to decide questions which were never submitted for decision, and thereby the board exceeded its jurisdiction. Subsequently, on April 22d, the employés served and filed a notice of motion that they would apply for the "entry of judgment of said court on awards made by said arbitrators on the respective questions submitted to said board of arbitration under clauses B and C of said agreement of submission,

and that the said judgment, so far as the same may apply to the said awards under said clauses B and C, respectively, may take effect and be in force from and after the 17th day of April, 1907." This motion and the exceptions above noted were thereafter heard by the court and submitted together, and present the questions to be determined herein.

1. The record discloses that the controversy involved in the arbitration grew out of antecedent negotiations had between the parties, the employés represented by their "General Committee" and the employer by certain of its officers, in an effort to bring about certain modifications in the schedule or agreement designated "Rules and Regulations of Pay of Telegraphers," then in force between the parties, commonly referred to as the "Schedule of 1902," the date of its adoption. These negotiations, which had been in progress for several weeks without the ability to come to a complete adjustment of differences, finally culminated in the agreement of arbitration which forms the basis of the proceeding. On the hearing before the board of arbitration, the employés took the initiative, and in submitting their case as to issue A, above stated, they introduced evidence showing that the train dispatchers in the service of the employer on the system involved, a majority of whom were members of the employés' order, had, by a vote of about two-thirds, authorized the general committee of the employés to represent and "legislate" for them in negotiations "in securing a new contract with the Southern Pacific Company." These authorizations were in writing in the form of letters and telegrams, and, while varying slightly in phraseology, were all of the same general import. They also introduced evidence tending to show the nature of the duties of train dispatchers, their status as employés, and the general mode of performing their service; and also showed that, under the existing schedule, the employés had, for a period of some eight years, been representing and legislating for the dispatchers in all negotiations of the kind. The employer did not attempt to rebut the evidence as to the fact that the dispatchers had given the employés authority to act for them, but was permitted on its part, over the objection of employés, to introduce evidence, largely expert or opinion in character, tending to show that a train dispatcher is an entirely different functionary from a telegrapher or "operator" so-called; that, while the dispatcher may be an operator, he is not necessarily such, his duties being very dissimilar in character, largely administrative, and of much greater importance, not only to his employer in carrying on the service, but to the safety and convenience of the public; that he stands in a different relation to his employer, as well in fact as in law, representing him in the discharge of his duties as an alter ego or vice principal in his relations with other employés; and, finally, that the feature of the schedule in force permitting the employés' order to legislate for the dispatchers as to rules of employment and rates of wages had been found to work very unsatisfactorily and injuriously to the service, and was a rule which did not obtain on the lines of any other general system.

The objection urged by the employés to the action of the board under this issue, and the only point made under their exceptions thereto, is that all the evidence thus admitted in behalf of the employer,

so far as it affected that particular issue, was wholly irrelevant and incompetent, and outside the issue; that the sole question involved in that issue, when properly construed, was whether the employés had been duly authorized by the train dispatchers to "legislate" for them respecting rates of pay, etc., and to represent them in the arbitration proceeding; that the moment such authorization was made to appear by the evidence the inquiry under this issue was closed, and the board was without authority to go further, but was bound to find the issue in the affirmative. But manifestly the language of that issue will not support this construction. It may be conceded that the contention is correct as to the merely incidental right of the employés to represent the dispatchers before the board of arbitration. That was purely a question of agency, and the dispatchers had a right perhaps to delegate it to any one they saw fit, regardless of the wishes of the employer. In fact, while some objection appears to have been made by the employer before the board of arbitration, it was overruled, and is not now being insisted upon. But the question whether the order "shall legislate for train dispatchers respecting rates of pay, hours of service, or otherwise" involves more than a mere question of agency, where the will and desire of the party conferring the power is alone to be considered. The language of the question is in the future tense, and very clearly involves a question of principle or policy affecting the relations of the parties and the methods of conducting the dealings of the employer with its dispatchers; whether, in other words, it shall for the future be permitted to deal with them directly, or shall be subject to the control of a third party, in establishing the rules, regulations, and rates of pay that shall obtain in their service. This was a question in which both parties to the controversy were at least equally interested, and one upon which it was very evidently the purpose of the framers that both parties should be heard. Had it been the purpose to submit the simple inquiry whether the employés had been empowered by the dispatchers, the issue, if put at all, would doubtless have been framed very differently; but, moreover, it would be convicting both parties to the controversy of a piece of idle folly to hold that they intended to submit to arbitration a mere question of fact so easily ascertainable. It is not contended that the character of the evidence was improper, if it was admissible at all, nor that it was not sufficient to sustain the finding, if the board's interpretation of the issue was the proper one. I am satisfied that the construction adopted by the board as to the nature of the question was correct, and that the exception cannot be allowed.

2. The only ground of exception to finding D which I deem it necessary to notice is whether the facts found thereby are within the issues submitted by the agreement. A difference arose between counsel of the respective parties in the hearing before the arbitrators, as to the meaning of question D as stated in the agreement, and as to the scope of the inquiry thereunder. The employés were confining their investigation purely to the literal terms of the question by inquiring as to the number and location of stations or agencies where the paramount duty of the agent was that of soliciting traffic. The employer objected that this was unduly restricting the inquiry un-

der that issue; that its real meaning, and the question intended to be thereby submitted, was as to the elimination from the operation of the schedule and the rule of seniority therein provided of stations or agencies, termed "starred stations," where the business of the company was such that the other duties of the agent were more important than telegraphing, where it was necessary to employ as agents men apt in business methods, familiar with traffic conditions, able successfully to solicit and gain business, superintend the men under their charge, look after the operation of freight and warehouses, handle and sell tickets of all kinds, and transact other commercial business— stations, in other words, where such qualities in the agent were of more essential consideration than his ability as an operator. And it was urged that, if the issue had been misunderstood, it should be amended or cleared up; and the board was requested to make a ruling for the guidance of the parties as to its interpretation of the question. The employés took the ground that there could be no misapprehension of the meaning of the question, that it was to be interpreted by its terms and the inquiry restricted, as therein specified, to agencies where the chief or paramount duty of the agent was soliciting traffic; and they objected to any amendment or any such construction thereof, as suggested by the employer, as being equally without the power of the board. After some considerable argument the board requested the parties each to file in writing his interpretation of the question for their information, and that it would then determine its meaning. This request was complied with by the employer, but the employés declined, upon the ground that they regarded the language of the issue as free from ambiguity, and preferred to stand upon its terms.

Thereupon the arbitrators, by a majority vote, ruled, in effect, that, while they could not amend the language of the question, it should be construed substantially as covering the ground contended for by the employer; and they permitted the evidence to take that scope. This action and the finding, made in response to the issue as thus construed, forms the basis of the exception to that feature of the award; the employés contending that the construction thus put upon the issue was wholly unwarranted and the finding thereunder not responsive to the question submitted, but entirely outside the issue and void. The employer contends, on the other hand, that the construction of the issue was fairly deducible from the terms of the agreement, but, if not, that it was perfectly competent for the board, in determining what the parties intended, to look to the negotiations leading up to the agreement, and that, viewed in the light of those negotiations, the ruling of the board was right, and its finding entirely responsive to the issue submitted. At the outset it may be remarked, in response to certain suggestions made at the argument, that the proceeding has its inception in and rests solely upon the agreement of arbitration entered into between the parties; that it is by the terms of that instrument, when properly construed, that not only the rights of the parties thereto, but the extent of the powers of the arbitrators thereunder, are to be limited and determined. The act puts the arbitration proceedings therein provided for in no different category in this respect than the ordinary common-law arbitration. Moreover,

while the proceeding is judicial in character, the relation of the parties is purely a contractual one, and in no respect, other perhaps than in the application of the rules of evidence, does the proceeding partake of the nature of a civil action. Therefore the rules of construction and interpretation applicable to contracts rather than those applicable to pleadings obtain. Nor is there anything in the act indicating, as suggested by one of the parties, that its provisions, either as to the requirements of the agreement for arbitration or the proceedings thereunder, are to be tested by any different or more liberal rules of construction than those applicable to other contracts or proceedings of a similar nature.

We are therefore to have resort, in determining the purpose of the parties under this agreement, to those usual and well-established canons of construction applicable to contracts generally; and, applying those principles, I am satisfied that, taking the language of the contract alone, the finding made in response to question D is not responsive to the issue thereby submitted. One of the cardinal rules for the interpretation of an instrument inter partes is that primarily it must be interpreted by its language, taken in its ordinary and accepted meaning, and, if that language is plain and unambiguous in itself, there is no room for construction, but it will be held to mean precisely what its terms imply. Very obviously this rule was violated in the construction placed by the arbitrators upon this feature of the agreement. The question related solely to agencies "where the duties of soliciting traffic are paramount." Nothing could well be plainer than this language. It is in no sense ambiguous, and there is nothing in itself nor elsewhere in the contract to indicate that it was employed in any technical sense, or otherwise than according to its ordinary import. It referred, neither directly nor by implication, to the character of agencies described in the finding, and the finding says nothing about the character of agencies referred to in the question. Counsel for the employer urge that the finding need not follow the precise terms as to descriptive words employed in the question, that it is sufficient if the finding involve in substance the issue submitted, and that every intendment is to be indulged that the award is responsive to the submission. This is perfectly true, but it does not mean that the ordinary rules of construction may be set aside nor the plain import of language ignored, nor that the contract may be given an interpretation it will not bear, merely because in the judgment of the board it did not cover all that the parties should have included in it.

Counsel also insist that the terms of the contract must be construed with reference to the circumstances and the spirit in which they were understood by the parties at the time when they were employed, and, for this purpose, the antecedent negotiations and respective claims of the parties may be looked to. The general rule in this regard is that if the language of a particular clause or feature of a contract is plain, explicit, and unambiguous, not involving an absurdity on its face, and not repugnant to the context, the meaning of that language cannot be controverted or affected by evidence either of the surrounding circumstances or of the understanding of the parties. What the court is to ascertain is, not what the parties may have meant or in-

tended, but what is the meaning of the words they have used. It is only when the language is susceptible of more than one construction that the intent may be inquired into. Springsteen v. Sanson, 32 N. Y. 703; Johnson v. N. W. Ins. Co., 39 Wis. 87; Maryland v. Railroad Co., 89 U. S. (22 Wall.) 105, 22 L. Ed. 713. In the last case, quoting from Lord Denman in Aspdin v. Austin, 5 Adol. & El. 671, it is said:

" 'Where parties have entered into written engagements with express stipulations, it is manifestly not desirable to extend them by any implications. The presumption is that, having expressed some, they expressed all the conditions by which they intend to be bound under that instrument. It is possible that each party to the present instrument may have contracted on the supposition that the business would in fact be carried on and the service in fact be continued during three years, and yet neither party be willing to bind themselves to that effect; and it is one thing for the court to effectuate the intention of the parties to the extent to which they may have even imperfectly expressed themselves, and another to add to the instruments all such covenants as upon a full consideration the court may deem fitting for completing the intention of the parties, but which they, either purposely or unintentionally, have omitted. The former is but the application of a rule of construction to that which is written. The latter adds to the obligation by which the parties have bound themselves, and is, of course, quite unauthorized, as well as liable to great practical injustice in the application.' "

But, if we were to resort to the negotiations in this instance, we should not be aided. The particular feature of those negotiations upon which counsel rely as showing the real inquiry intended to be submitted under question D is a letter written by the employer to the general committee of the employés' order, dated January 17, 1907, and with other correspondence and matter relating to the negotiations, included in what is referred to in the record as the "Blue Book." In this letter the employer stated the reservations it desired at that time to make in the existing schedule, substantially as it now claims they were intended to be covered by question D; and it is insisted that the question is to be interpreted in the light of this letter. But the fallacy of this is apparent when it is noted that this letter was written nearly a month prior to the execution by the parties of the agreement of arbitration, and there is absolutely nothing in the so-called "Blue Book" or elsewhere in the record to show, on the one hand, that the employés ever accepted the suggestions made in that letter, or, on the other, to negative the very strong inference to be deduced from its executing the agreement in its present form, that the employer entirely abandoned the terms of its proposition made in the letter and acceded with open eyes to the terms as stated in the contract. The presumption, in the absence of fraud or mistake, is, of course, that the contract expresses the stipulations in the terms in which both parties understood them. This being the state of the record, there is nothing in the prior negotiations which can be looked to in aid of the interpretation of the question. But, moreover, counsel for the employer have very conclusively answered their present contention against themselves. Very early in the taking of testimony before the board this "Blue Book" was offered in evidence by counsel for the employés for the purpose, among others, as stated by him at the time, of throwing light upon this very question of the construc-

tion to be put upon question D; the "Blue.Book" constituting, as he suggested, the basis of the negotiations leading up to the contract. But the offer was strenuously objected to by the employer for any purpose; one counsel urging:

"That any prior negotiations between the employer and employé would shed no light on this controversy. It would tend to cloud the issue. Therefore it is immaterial. The rule of law is that an offer to compromise or prior negotiations are not admissible in evidence at all. In other words, the court goes right to the merits of the present transaction. For the purpose of eliminating such matters, I think the board should not consider any prior offers or counter offers on the part of the employer or the employé."

And another of counsel used this language:

"The fundamental error lies in counsel's statement that these antecedent negotiations are the basis of this arbitration. He said that and he said it quite heatedly, and that is the time when I wanted to ask him a question. The antecedent negotiations are not the basis of this arbitration. Your honorable body is called together under an act of Congress. The act has specified that the questions to be submitted to the board shall, with a good deal of formality, be stated as the basic matter invoking the jurisdiction of a board. That has been done. We have now here before us, in conformity to the act, a statement in writing of the matters that are in issue between us. The antecedent negotiation is just as much shunted and pretermitted by the filing of the statement of the matters in issue between us under the interstate commerce act as the antecedent matters are between two private litigating parties when one of them files a complaint and the other files an answer. It is then put in issue. It is an error fundamental to say that the basis of this matter is anything antecedent to the signing and filing of the agreement to arbitrate. That is the only limit to your jurisdiction. It not only limits, but it delimits it. Your jurisdiction is as broad as the matter set forth in the articles. It is no broader. You are a body sitting here to determine law and fact. You are a court. The learned gentleman says you cannot determine these matters in issue between us without resorting to the antecedent negotiations. That is error. If you cannot determine it without resorting to illegal and incompetent evidence, that is a practical difficulty in the way, which sometimes—but rarely—happens. The law of convenience does not govern in judicial matters. There could be a case where a party would be practically cut off by the laws of evidence of the state from proving a case. That is a practical difficulty. He says they cannot be determined without resorting to these writings, these printed matters, these negotiations, these offers upon the one side and upon the other side, to determine it. I submit, with all gravity, that you can only find what the issues are between us by an inspection of the four questions stated in the articles of agreement."

And one of the very reasons urged at the time by counsel for employer in support of their attitude as above stated was that there was nothing to show what the parties had in mind at the time of signing the agreement but the instrument itself. As a result, the offered evidence was excluded and the board refused to consider it. At the argument before the court a question arose between counsel as to whether this "Blue Book" was not subsequently put in evidence; counsel for employer insisting that it had been. But the record does not show that it was, and the book, while found among the papers, unlike all other exhibits, bears no file or identification mark. For the reasons stated, however, it is immaterial to determine whether the evidence was before the board for its consideration or not.

It would be difficult, I think, to state the rule as applicable to this case more forcibly than counsel for employer have thus put it; and

I am satisfied therefrom that the construction placed by the board on question D was unwarranted, and that its finding thereunder was outside the issues submitted by the parties. The facts therein found, not being within the issues, the finding must be held nugatory and not binding upon either party. Bogan v. Daughdrill, 51 Ala. 312; Richardson v. Payne, 55 Ga. 167; Gordon v. Tucker, 6 Me. 247; McBride v. Hogan, 1 Wend. (N. Y.) 326; Bullock v. Bergman, 46 Md. 270.

3. As to the motion for judgment on findings B and C, it is at least doubtful if, under this act, a judgment can be had on part of the award when a part is set aside; and it is likewise doubtful, independently of the act, whether under the general rules applicable to proceedings of this character the issues submitted here are not so interdependent and inseparably a part of one controversy that they must all stand or fall together. But, if I am correct in my reading of the act, the motion is premature, and those questions not now before the court. As we have seen above, the act provides that, where exceptions are filed to the award, it shall go into effect, "and judgment be entered accordingly when such exceptions shall have been finally disposed of, either by said circuit court or on appeal therefrom." The same section further provides:

"At the expiration of ten days from the decision of the Circuit Court upon exceptions taken to said award, as aforesaid, judgment shall be entered in accordance with said decision, unless during said ten days either party shall appeal therefrom to the Circuit Court of Appeals. * * * The determination of said Circuit Court of Appeals upon said questions shall be final, and being certified by the clerk thereof to said Circuit Court, judgment pursuant thereto shall thereupon be entered by said Circuit Court."

From these provisions, it would seem that it is not contemplated by the act, where exceptions are urged against the award, that judgment shall be entered by the Circuit Court until the expiration of 10 days after the decision on the exceptions. If no appeal has then been taken from such decision, judgment shall be entered, either putting into effect or setting aside the award as the circumstances may warrant. If within the 10 days, however, an appeal be taken, then the entry of judgment must await the determination of such appeal, when final judgment may be entered pursuant thereto. Very evidently the act does not warrant a piecemeal judgment such as contemplated by the motion; but one final judgment, which shall be determinative of the whole matter.

Having in view the very commendable object aimed at by the act, I regret much the necessity of reaching a conclusion the result of which, if sustained, will be partially, if not entirely, to set at large the differences between the parties out of which the controversy arises. The evident purpose of the law was to afford a ready, summary, and speedy method of amicably adjusting labor disputes arising between the class of employers and employés to which it applies; and, the case being a pioneer thereunder, a more satisfactory result of its operation would have been desirable. There are certain features of the act, however, which, although doubtless intended to add to the simplicity of the procedure provided therein, are calculated to result, as in

this case, in making cumbersome and burdensome its operation, and to largely negative and defeat the object of a speedy determination of a controversy. As noted above, the entire record—papers, testimony, and exhibits—consisting in this case of something over 3,000 pages, is treated as a bill of exceptions for the purpose of review in this court. This would not be so objectionable in itself if there was any requirement at the hands of the excepting party of presenting a specification of the errors relied upon in some such form as would definitely point out the objections involved in the exceptions. In this instance, the exceptions filed were in the most general terms, with no attempt therein or in the brief of counsel to point out the particular page, or even the volume in which any obnoxious evidence or ruling was to be found. As a result, the evidence upon all the issues being intermingled, the court has been put to the necessity of searching through the entire record at the expense of much valuable time, and the great and unnecessary delay of its conclusion. This result could be avoided, either by providing, as in other instances, for a bill of exceptions presenting only the specific errors relied upon, or by a provision requiring the party excepting to the award to file such a specification of errors as would serve to point more particularly the rulings complained of.

For the reasons above stated, the exceptions to finding A will be overruled, the exception to finding D will be sustained, and the motion for judgment will be denied. Let an order be entered to that effect.