## MUNICIPAL CONTRACT WITH UTILITY NOT IMMUNE FROM LEGISLATION.

Common Pleas Court of Cuyahoga County.

CITY OF LAKEWOOD V. THE CLEVELAND ELECTRIC ILLUMINATING COMPANY.

Decided, October 23, 1918.

*Construction of the Public Utilities Act—Its Controlling Effect Upon Stipulations Contained in a Franchise Ordinance—Agreement Between a Utility and Municipality may be Contractual in Form— But is not Immuné from Legislation—Change may be Made by the Legislature by Prescribing a Different Method of Procedure by the Utility—Without Impairment in the Constitutional Sense of an, Existing Contract with the Municipality.*

1. Where acting under Section 3618 a municipality erects, maintains and operates an electric plant for the purpose of furnishing its inhabitants with light, heat and power, no rights are acquired by inhabitants by reason of contracts entered into by them with the municipality for such purpose nor can such contracts be enforced. The plant in such a case, with all of its appurtenances, is subject to sale and transfer, and where a valuable consideration has been agreed upon and the purchaser has entered into possession with the acquiescence and by virtue of the affirmative acts of the municipality, a valid sale has been made.

2. Where a municipality, by acquiescence and affirmative acts, permitted the purchaser of such lighting plant and appurtenances to use and occupy its streets and public places with its equipment, and where it and its inhabitants received light, heat and power uninterruptedly and without objection for nearly twelve years, the consent of the municipality, provided by law for such occupancy, will be presumed, and the parties will be estopped from denying such consent.

3. An ordinance granting to such purchaser the consent of the municipality for the occupancy of. its streets, alleys, etc., and also authorizing the sale of the electric plant, contains two subjects, and is void; and its provisions regulating charges for service, extensions and additions are not binding on either of the parties.

4. Contracts which inure to the benefit of the inhabitants of a municipality by virtue of a franchise granted to a public utility corporation, and which grow out of and form an element of its franchise, are subject to and are superseded by the Public Utilities Act, un-

less the power to grant such franchises and such rights is conferred by valid constitutional statutes in express, clear and unmistakable terms.

*R. G. Curren,* Director of Law, for plaintiff.
*Tolles, Hogsett, Ginn & Morley* and *Frank M. Cobb,* contra.

FORAN, J.

This is an action for final, mandatory and preventative injunction, the prayer of the petition asking that the defendant be required to perform certain positive acts and be enjoined from performing certain other acts. It was tried upon the pleadings and a stipulation as to such facts as were competent, relevant and material.

Briefly stated, the facts are that the plaintiff is a city and duly organized municipal corporation, located in Cuyahoga county, and is the successor of the village of Lakewood, a duly organized municipal corporation, existing as such before Lakewood became a city. The village of Lakewood, some years prior to March 18, 1907, erected and installed at public expense a municipal electric lighting plant or system for public and private lighting within its corporate limits, which lighting plant, with all its appurtenances, the village of Lakewood, on or about March 18, 1907, sold and transferred to the defendant, the Cleveland Electric Illuminating Company, for the sum of $76,600. The defendant is an Ohio corporation, organized under Section 3471*a* Revised Statutes, being an act supplementary to Sections 3454 to 3471, inclusive, Revised Statutes, passed by the General Assembly January 26, 1887 (84 O. L., 7). The sale was consummated by an ordinance of the village of Lakewood adopted and in full force, so far as the village was authorized to pass said ordinance, March 18, 1907. This ordinance contains certain conditions and stipulations which were formally accepted by the defendant company. By the terms of the ordinance, the defendant is granted the right to erect, maintain and use all the necessary appliances essential to transmit electricity through the streets and alleys of the village, for the purpose of furnishing the public and private persons light, heat and power. Among the conditions essential to a continuance of the rights and priv-

ileges granted are the provisions of Section 6, which read as
follows:

"Section 6.   The said the Cleveland Electric Illuminating
Company, its successors and assigns, shall extend their wires
overhead, on any street, lane, alley or highway, and furnish light
therefrom whenever contracts with private consumers can be
secured at the rate of one for each three hundred (300) feet of
overhead extension desired, and such extension shall be made
without cost or expense to such consumers."

The plaintiff, as successor of the village, avers in its petition
and reply that the defendant accepted the terms of the ordi-
nance and for a number of years exercised and enjoyed all the
rights and privileges therein granted, but for many months past
has refused to comply with the terms and conditions of Section
6 thereof, unless the applicant for extensions and current within
the 300 feet limit prescribed shall deposit with the defendant a
specified amount, with the stipulation or agreement that only a
part of the amount so deposited shall subsequently be refunded,
and that said defendant, in violation of its contract with it, as
successor of the village of Lakewood, as evidenced by the said
ordinance and especially Section 6 thereof, refuses to make the
extensions therein provided for, unless the applicant or con-
sumer shall advance the necessary cost and ultimately pay a
portion thereof.

The defendant interposes three defenses:

*First,* that the provisions of Section 6 of said ordinance "were
wholly unauthorized and *ultra vires* of the powers of said vil-
lage and are null and void and are not binding or obligatory
upon either the village or upon the defendant."

*Second,* that the provisions of Section 6 of the said ordinance
are repugnant to and inconsistent with certain sections of what is
popularly known as the public utilities act, passed by the Gen-
eral Assembly May 31, 1911 (102 O. L., 549), and because of the
failure to comply with the provisions of Section 53 of said act,
now known as Section 614-51, General Code, and exercise the
remedy therein prescribed, it is not entitled to the relief de-
manded.

For its *third* defense, defendant says it, on October 27, 1917, and on other dates thereafter, issued and filed with the public utilities commission its rules and regulations providing for and affecting additions and extensions and charges therefor to consumers for commercial loads of 5 K. W. capacity and less, and such loads in excess of 5 K. W. capacity, which rules and regulations were issued and filed in compliance with the provisions of said public utilities act; that by special permission of the Public Utilities Commission, these rules and regulations became effective as of the date such permission was given by said Public Utilities Commission and are, at this time, the only lawful and effective rules and regulations governing the defendant in making additions and extensions and prescribing charges therefor. These rules and regulations require all applicants for extensions and additions to deposit with the defendant the entire estimated cost of the same, with the understanding that the estimated normal cost of the extensions and additions, as of July 1, 1914, will be refunded to the applicant in accordance with certain specified conditions. These requirements, it is claimed by the defendant, are made imperatively necessary to the practical operation of its business by present war conditions, creating a large demand upon it for electric power by persons engaged in manufacturing and furnishing the United States Government with all kinds of war products and material, which demands it claims have so taxed its generating and distributing system as to require large additional capital, which can not be secured without the consent— which consent can not be had—of the Public Utilities Commission and the capital issues committee, created by act of Congress approved April 5, 1918.

The evidence does not clearly support the contention of the defendant as to this third defense, except as bearing upon the well known and understood economical and historical fact that while peace relaxes, war tends to develop the strength of governmental function and of necessity actually does increase and broaden the sphere, scope and powers of governmental organization. It is quite obvious that when a nation is prosecuting a great war for the preservation of its institutions and its honor and integrity, and upon the ground that the liberty of mankind

and the civilization of the world are menaced, every atom of its resources, political life and energy must be conserved, and no part of its constitutional or inherent powers can in the slightest manner be abated, modified or relaxed. The court has no illusions as to the motives which prompt the defendant in invoking the public utilities act and the police power of the state to aid it in escaping contractual obligations which have become burdensome and onerous by reason of war conditions. No one will seriously contend that these motives are public spirited, wholly disinterested or altruistic, but as legal exegesis is not governed by motive, a consideration of that phase of the controversy would be unprofitable, if not gratuitious.

It must be admitted that when the defendant entered into negotiations with the village of Lakewood, it was casting an anchor to westward or seeking to protect its western flank from the possible aggression of competitive forces. The prowess of the defendant as a visored knight in jousts of competition is well known and in this respect its shield and its lance remain unbroken, but as the issues before the court involve problems in hermeneutics, rather than questions of morals or ethics, a consideration of that phase of the subject is necessarily foreclosed. [In this connection, however, it may be said that when a public service corporation is subjected, as it often is, to the exegencies of party politics, its right to defend itself and the interests of its stockholders committed to its keeping will not be denied; nor will the methods or measures adopted, under such circumstances, to present to the public the other side of the shield be too closely scrutinized.]

At the very threshhold of our inquiry looms the pregnant judicially decided fact and conclusion that when the village of Lakewood, some year prior to 1907, appropriated and employed public funds, raised by taxation of its citizens, to erect and install a municipal lighting plant to furnish light, heat or power to its inhabitants, its act in so doing was not within the scope of its powers and was clearly *ultra vires*. It will, of course, be conceded that a municipal corporation is a mere department of government or political sub-division of the state, made necessary by the need of relieving the central authority of the state

of the routine and details of local government, and that such corporation has no power even in municipal affairs, except those expressly granted by the state or which may be fairly inferred from the language, scope, purpose and object of the grant, or which may be said the state, by clear intendment, intended to grant.

In erecting and installing its municipal lighting system, the village of Lakewood evidently acted upon the belief that the authority to do so was conferred by sub-division 15 of Section 1536-100, Revised Statutes, which section at the time contained the enumeration of powers granted to municipal corporations by the Legislature. Among other things, it is provided by Subdivision 15 of this section that municipal corporations shall have power, when properly exercised by its council by ordinance:

"to establish and maintain municipal lighting, power and heating plants and to establish, maintain and operate natural gas plants and to furnish the municipality and the inhabitants thereof with natural gas for heating, lighting and power purposes, and to acquire by purchase, lease or otherwise, all necessary lands for such purposes, within and without the municipality."

Even a cursory reading of this act clearly shows that while a municipal corporation might appropriate public moneys to build and install an electric plant to light its streets and public buildings, it was wholly without power to erect and install and maintain such plant or system for the purpose of furnishing light, heat or power to its citizens, as the intention of the Legislature is clearly gathered from the provision relating to natural gas plants, where it is provided that the municipal corporation may establish, maintain and operate natural gas plants and furnish the municipality and the inhabitants thereof with natural gas for heating, lighting and power purposes, but no such provision is found in the statute empowering a municipality to furnish electric light, heat or power to its inhabitants or citizens, and it was so held by the Supreme Court in *Jackson, a tax-payer, etc.*, v. *City of Nelsonville et al*, decided February 4, 1908 (77 O. S., 637), where the judgment of the Circuit Court of Athens County was reversed.

"because at the time of entering upon the enlargement of the electric plant, the statute contained no authority for furnishing electricity to citizens."

At the time of this decision, the Legislature was in session and within a month thereafter the act now known as Section 3618, General Code, was passed (99 O. L., 34, Section 7o). This section gives to municipal corporations the power to establish, maintain and operate municipal lighting, power and heating plants and to furnish the municipality and the inhabitants thereof with light, power and heat.

This may be important only as showing that at the time the village of Lakewood passed the ordinance in question it was dealing with property it had no right to acquire for all the purposes for which it acquired it and used it. One of the really important and vital questions in the case is the maintenance of the proposition that any legislation, whether state or municipal, which discriminates as between citizens or classes is subversive of the public safety and the public welfare, and if this proposition is sound, it necessarily follows that the reservation by the state of the authority and power to regulate public service corporations is vitally important. Why should a citizen of the village of Lakewood, whose dwelling was equipped for and lighted with gas, be taxed to supply electric light to his more ambitious neighbor? Manifestly, the village had no authority to so tax a citizen without his consent, unless the power to do so, granted by the state, was unmistakably clear. No such power having been granted to the village of Lakewood, any citizen of that village might have enjoined the operation of this municipal lighting plant at his pleasure. The village having, however, received the purchase price, and the defendant having taken and appropriated the equipment, both would be estopped from electing to rescind the contract so far as the purchase of and payment for the plant was or is concerned, as neither of the parties can be now placed in *statu quo*.

It must be remembered, however, that the ordinance, in so far as it provided for effecting the sale of the village plant to the defendant, related to property the village had no legal right to

acquire, maintain or operate, except in its proprietary capacity, and if we treat the parties as being estopped from rescinding the contract so far as the sale is concerned, and treating the ordinance merely as a grant or franchise or consent to the defendant, it will be seen at a glance that there were two separate and distinct propositions involved in the transaction.    The provisions of the ordinance relating to the sale are found in Section 8 of the ordinance.    This section provides in effect that the validity of the ordinance or grant and its continuance is made conditional upon the payment by the defendant to the board of trustees of public affairs of the village of $76,600, in accordance with the defendant's offer and bid for the village lighting plant, and the acceptance of the same by the trustees and the due execution of the sale and transfer of the property.

The title of the ordinance is:

"An ordinance granting to the Cleveland Electric Illuminating Company, its successors and assigns, the right to erect, construct and maintain and use the necessary poles, wires, conduits and such other fixtures and appliances, overhead and underground as may be deemed by it or them necessary or essential to enable it or them to transmit electricity through and along the streets, alleys, and ways of the village of Lakewood, for the purpose of furnishing said village, the general public and private persons, light, heat and power by electric currents."

It will be seen that Section 8 has no connection whatever with this title and is wholly repugnant to it and is wholly foreign to the purposes expressed in the title.

If there was a contract, as appears, between the board of trustees of public affairs of the village and the defendant, for the sale of the village plant and the defendant had paid, or was ready and willing to pay, the price agreed upon, an ordinance effecting the sale was really not necessary, as it might have been done by resolution or motion.  *Kerlin Bros. Co.* v. *City of Toledo,* 20 O.C.C., 603.

Section 4226, General Code, prescribing the mode and manner of passing of ordinances by municipalities, provides that

"No ordinance, resolution or by-law shall contain more than one subject, which shall be clearly expressed in its title."

The provision of this section, that no ordinance shall contain more than one subject, is mandatory (*Bloom* v. *Xenia,* 32 O. S., 461; *Campbell* v. *Cincinnati,* 49 O. S., 463); in which cases it was, in substance, held that where two ordinances are required, a separate vote on each is necessary. This doctrine is approved in *Heffner* v. *City of Toledo,* 75 O. S., 413. The court says in the syllabus that the requirement that no ordinence shall contain more than one subject

"was intended to prevent the uniting in one ordinance of diverse subjects or measures and affecting its passage by uniting in its support all those in favor of any, and to prevent the adoption of ordinances by the votes of councilmen ignorant of their contents."

The provision "which shall be clearly expressed in its title" is held directory in *Pim* v. *Nicholson,* 6 O. S., 176. These provisions of Section 4226, General Code, were evidently suggested by Section 16, Article II of the Constitution; the language, except that "ordinance" is substituted for "bill," is identical.

In *People* v. *Mahaney,* 13 Mich., 481, the court say:

"The practice of bringing together into one bill subjects diverse in their nature and having no necessary connection, with the view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the state."

This language is quoted with approval in *Heffner* v. *City of Toledo,* supra. See also *McQuillan,* "*Municipal Corporations,*" Section 681.

Obviously the ordinance as passed contains two subjects; first, the granting to the defendant of a franchise, or rather, giving its consent to the defendant to use and occupy its streets, alleys and public grounds for the erection and installation of its poles, wires and other necessary appliances, to furnish heat, power and light to the village and its citizens. Second, the purchase by the defendant of the municipal lighting plant, at that time owned and operated by the village. These two subjects are clearly distinct and separate as to subject-matter, for it is provided in Sec-

tion 8 that unless the defendant purchased and paid for this lighting plant, in accordance with its offer to the board of trustees of public affairs, and the purchase price was accepted by said board, the consent or grant failed and the whole ordinance became void. It is quite obvious that some members of the council may have believed that the price paid for the plant was wholly inadequate, but were induced to vote for the ordinance by reason of the apparently liberal terms the defendant was willing to concede by its acceptance of the ordinance, but no one can say how the negotiations would have terminated if the council had been given an opportunity to vote separately upon each proposition or subject embraced in the ordinance. A larger price might have been received or more liberal concessions as to service and charges might have been conceded by the defendant. It might therefore be held that the ordinance was illegally passed and of no binding effect, except as affected by the retention of benefits, acceptance, user and estoppel. We are not, however, inclined to base a decision on the questions raised wholly upon this point alone, as we believe there is a broader and more paramount issue or principle involved.

Waiving the illegality of the ordinance, which we think clear and unmistakable, we proceed to a consideration of the more important question directly affecting the general welfare and the public policy of the state; that is, if we eliminate Section 8 of the ordinance and leave the parties, so far as the sale of the village lighting plant and payment therefor is concerned, in *statu quo,* we find that the ordinance, assuming its validity for the time being, is a mere grant or franchise or consent by the village of Lakewood that the defendant may use and occupy the streets, lanes, alleys and public grounds of the village with its necessary appliances and equipment "for the purpose of furnishing said village, the general public and private persons light, heat and power by electric currents." So far as extensions and additions are concerned, the grant is perpetual and is not affected by the ten year limit of proprietary contracts.

The question is now squarely presented: Had the village of Lakewood, on March 18, 1907, the authority and power to preclude and foreclose the state of Ohio from the exercise of its

police power to regulate and prescribe the mode and manner in which a public utility should perform its functions toward all its citizens equally, equitably and without discrimination, and prevent extortion and unjust charges for extensions and service?

As here used, by "utility" is meant "that property in any, object whereby, it tends to produce benefits, advantage, pleasure, good or happiness" (*Jevons Pol. Econ.*, p. 42). By "public utility," of course, is meant a utility whose benefits and advantages are open to and shared in by all, and not limited to any particular class of the community.

Plaintiff claims that the acceptance of the ordinance, and especially Section 6 thereof, by the defendant constitutes a binding contract which is protected by both state and federal constitutional inhibitions against the passage of laws impairing the validity or obligation of contracts, but it has been frequently held that even a charter contract does not prevent the operation of the police power, when invoked to protect the public peace, safety, health and morals. Even the state itself can not bargain or barter away its police power. The police power of the state is the authority conferred upon all states under the American constitutional system, to adopt such laws and regulations, in addition to those intended to prevent crimes and offenses, as tend generally to secure "the comfort, health and prosperity of the state, by preserving the public order, preventing a conflict of rights in the common intercourse of the citizens, and securing to each an uninterrupted enjoyment of all the privileges conferred upon him by the laws of his country."

A consideration of the *raison d'etre* of the power may be more illuminating than an attempted definition. A primary object of society is the security which was found essential by men confronted with the same dangers and difficulties the very moment a social state was organized on any part of the earth. Every man in a social state or in society has certain rights, sometimes called natural rights, but to obtain for all equality in the enjoyment of rights and avoid conflicts, every right is necessarily limited by a duty. Right and duty both spring from conscience and are based upon moral rules and obligations existing anterior to the positive laws created by the social state. Right and duty

are the cornerstones of freedom and liberty, as the sources of action, and this simply means that the objects of society can not be attained unless its individual members are willing to divest themselves of the exercise of such rights as would, if exercised, prevent society from attaining its objects and purposes, for every citizen must, in consideration of the protection of his rights, accept all the duties which society imposes, as society would cease to exist if there was no constraining power requiring the co-operation of all to attain the ultimate objects and purposes of society.

This view of the right of a state to regulate the conduct of its citizens Ranney, J., had in mind in *Railroad Co.* v. *Keary,* 3 O. S., 202. See page 206. Shaw, C. J., had the same view in mind in *Commonwealth* v. *Alger,* 7 Cush., 85.

The rule is very explicitly stated by *Cooley, Con. Lim.,* page 833, 7th Ed., where ,speaking of the police power of the state, he says:

"The occasions to consider this subject, in its bearings upon the clause of the Constitution of the United States which forbids the states passing any laws impairing the obligation of contracts, have been frequent and varied; and it has been held without dissent that this clause does not so far remove from state control the rights and properties which depend for their existence or enforcement upon contracts, as to relieve them from the operation of such general regulations for the good government of the state and the protection of the rights of individuals as may be deemed important. *All contracts and all rights, it is declared, are subject to this power; and not only may regulations which affect them be established by the state, but all such regulations must be subject to change from time to time, as the general well-being of the community may require, or as the circumstances may change, or as experience may demonstrate the necessity.*"

No language could be clearer or more explicit than this. The statement that all contracts and all rights are subject to the police power, leaves nothing to be inferred, and the statement by this learned writer that not only may regulations which affect contracts be established by the state, but that all such regulations must be subject to change from time to time, as the gen-

eral well-being of the community may require, or as the circumstances may change, or as experience may demonstrate the necessity, is the clearest and most far reaching statement or exposition of the police power of the state that has come under our observation. Many authorities are cited by the author to sustain these broad general statements.

The leading case is parhaps the case of *Thorpe* v. *Rutland & Burlington R. R. Co.*, 27 Vt., 140. The question arose under the provisions in the Vermont statutes which required railroad corporations to erect and maintain fences and cattle-guards on the line of their roads, and it was held by the court that the right of the Legislature, by the general statute, to require all railroads, whether now in operation or to be hereafter chartered or built, to fence their roads and provide sufficient cattle-guards at farm and road crossings, was undisputed, and this it was said was—

"Perhaps, no more than the enunciation of a general principle applicable to all free states, and which can not, therefore, be violated so as to deprive the Legislature of the power, even by express grant to any mere public or private corporation. And when the regulation of the police of a city or town, by general ordinances, is given to such towns and cities, and the regulation of their own internal police is given to railroads to be carried into effect by their by-laws and other regulations, it is, of course always, in such cases, subject to the superior control of the Legislature. That is a responsibility which legislatures can not divest themselves of, if they would."

In *Beer Co.* v. *Massachusetts*, 97 U. S., 25, the court, in the syllabus, say:

"As the police powers of a state extend to the protection of the lives, health and property of her citizens, the maintenance of good order, and the preservation of the public morals, the Legislature can not, by any contract, divest itself of the power to provide for these objects."

In the case of *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 548, Taney, C. J., says:

"The continued existence of a government would be of no great value if, by implications and presumptions, it was dis-

armed of the powers necessary to accomplish the ends of its creation.''

In the case of *State of Maryland, etc.*, v. *B. & O. Ry. Co.*, 22 Wall., 105, it appears that the State of Maryland, in 1836, passed a law making a subscription of three million dollars to the B. & O. R. R. Co., but providing if the company did not locate the road as provided in the act, the company should pay a forfeit of one million dollars to the state. In March, 1841, the state passed another act, changing the route. It was held that this was a matter of state policy which it had a right to change if the policy was afterwards discovered to be erroneous.

The modern decisions in support of these principles are very numerous, but an inspection or analysis of these cases will disclose that they are mere affirmations or amplifications of this well established doctrine. While it is conceded that the police power may not encroach upon vested rights, yet it must also be conceded that any corporation, including a municipal corporation, whether its charter is subject to amendment or not, is always subject to the exercise of those general police powers of the state which have for their object the regulation of rights for the common good of the general public, the purpose of the power not being to take away rights, but by appropriate regulation to harmonize and equalize the enjoyment of rights by all citizens. It can not be said that a mere expectation, based upon an anticipated continuance of present general laws, confers a vested right. Rights do not vest until all the conditions of the law have been fulfilled with exactitude during its continuance or a direct engagement has been made limiting legislative power over and producing an obligation. *State Bank of Ohio* v. *Knoop*, 16 How., 408; *Morton* v. *Nebraska*, 21 Wall., 660-673.

The right of the state to exercise the power of regulation over public service corporations is so essential to the public welfare that any injudicious limitation of the power or any attempt to contract not to exercise it might result in depriving the state of some of its attributes of sovereignty and prevent it from fulfilling the very objects and purposes of its creation. To pro-

vide for the public welfare of the state at large and of individuals or citizens collectively, is the highest function of government, the main purpose of which is to secure the greatest good to the greatest number. The most striking illustration of the exercise of this power is found in prohibition statutes, which, claiming justification in reasons of supreme public benefit, practically confiscate private property. Another illustration may be seen in the enactment of laws which permit the destruction of private property, in order to prevent the spread of a conflagration or fire which threatens destruction of a city. Such laws proceed upon the theory of accomplishing the greatest good for the greatest number. Under modern industrial and commercial conditions, public service corporations have become so powerful that to deny the right of the state to regulate their activities at any time would be destructive of the social and economical life of the people.

A brief examination of a few of the modern authorities cited may not be unprofitable.

In *Home Telephone & Telegraph Co.* v. *City of Los Angeles,* 211 U. S., 265, the object of the suit decided in the case was to restrain the enforcement of certain ordinances which fixed the rates to be charged for telephone service. The court in the syllabus said:

"Only the Legislature of a state, or a municipality specifically authorized thereto by the Legislature, can surrender by contract a governmental power such as fixing rates. To grant a corporation the right to charge a specified rate for a specified time, suspends for such period the governmental power of fixing and regulating rates, and in construing the franchise, all doubts, both as to the existence of the contract and authority to make it, *must be resolved against such suspension of power.*"

In *Woodburn* v. *Public Service Corporation,* 82 Ore., 114, it is held in the syllabus:

"If a telephone company's franchise from a city, limiting rates to be charged, is deemed a contract, the mere fact that it was made prior to the enactment of the public utility act and before the state attempted to regulate such rates, does not debar the state from increasing the rates as fixed in the franchise, be-

cause when the state exercises its police power, it does not work any impairment of the obligation of the contract; the possibility of the exercise of such power being an implied term of the contract.''

Or, in other words, the council, in passing Section 6 of the ordinance of the village of Lakewood under consideration, it must be held had in contemplation the possibility of the exercise of the power of the state to change its terms, and that the contract, if it can be called a contract, was made in contemplation of such exercise of power, and that such exercise of power was a part of the contract.

In the *City of Benwood* v. *Public Service Com.*, 83 S. E., 295, the Supreme Court of Appeals of West Virginia held, as a matter of law, in the syllabus that:

''Where, by franchise or ordinance, public service rates within a municipality have been fixed and accepted as between a public service corporation and the public, without express delegation of power in such particular by the Legislature to the municipality, a change of the rates by the public service commission does not impair the obligation of a contract.''

It must be held that at the time the village of Lakewood passed the ordinance in question, there was in the enumeration of powers conferred by the state upon municipalities no ''express delegation of power to fix rates for extensions, additions or charges.'' For, as was held in *Charleston Lighting Co.* v. *City of Charleston*, 75 S. E., 390:

''The state will not be presumed to have intended to delegate to municipal corporations the power to fix the charges of public service corporations, unless such intention is clearly and unmistakably expressed.''

Such clear and unmistakable delegation of power to the municipal corporations of Ohio can not be found in the enumeration of powers under which such municipal corporations were operating at the time this ordinance was passed.

In *Collingswood Sewerage Co.* v. *Borough of Collingswood*, 102 Atl., 901, the Supreme Court of New Jersey expressly held in the syllabus that:

"An ordinance granting consent of a municipality to the incorporation of a sewerage company under the act of 1898, and fixing maximum and minimum rates, is a grant upon condition, rather than a contract. The Legislature may clothe a public commission with power to fix higher rates, upon petition by the sewerage company."

It must be remembered that whatever may be said relative to private corporations, the Legislature has power at any time to alter, modify or amend the general enumeration of powers conferred upon municipalities. When the court in this case said that the grant to the sewerage company was a grant upon condition, rather than a contract, the same may be said with respect to the grant by the village of Lakewood, if the ordinance under consideration was legally passed, that is, it was a grant upon condition that the same might be modified, changed or restricted by the Legislature at its pleasure.

Numerous other modern cases might be cited to the same effect, but we think the cases here cited are sufficient to justify the observation of the court that modern authorities in effect only affirm or amplify the general principles laid down by Judge Cooley and the other older authorities already cited.

Before taking up the scope and purpose of the public utilities act, it may be well to inquire if Section 6 of the ordinance under discussion, assuming its validity, constitutes a contract between the city of Lakewood, as the successor of the village of Lakewood, and the defendant. It will be noted that this section provides that extensions shall be made and light furnished—

"Whenever contracts with *private consumers* can be secured, at the rate of one for each three hundred feet of overhead extension desired."

If this is a contract, evidently it runs in favor of certain persons and not to the plaintiff in its proprietary capacity, nor to the citizens of the plaintiff city generally. It does not provide that the city of Lakewood, in its proprietary right, may demand extensions to furnish light to its streets or public buildings, even if the location of the streets or the public buildings bring them within the provisions of this section of

the ordinance. That the ordinance unjustly discriminates as between citizens must be admitted.

Suppose, for instance, the defendant's wires are installed on West Madison avenue, which runs due east and west through Lakewood, and that a new street is opened, running north and south across West Madison avenue, and on this new street one residence is located, just 300 feet south from the intersection, he would be entitled to light. But suppose a residence or factory is located 305 feet north of the intersection; it is denied light or power unless the defendant sees fit to make the extension without cost. This is clearly an unreasonable discrimination.

Under the provisions of the public utilities act, the city or an individual complying with the provisions of the act, may compel the defendant to make extensions and furnish heat, light, or power if, in the opinion of the commission, the demand therefor is reasonable under all the circumstances. It is indeed difficult to understand how Section 6 of this ordinance confers any right upon anyone that is consistent with the rights of others and of the public policy of the state.

We think the most that can be said is that it is a grant on condition that the state may not see fit to enact regulations governing the extensions, additions and service. Or, in other words, can the right be said to be more than a mere expectation based upon an anticipated continuance of the general laws of the state in force at the time the ordinance was passed?

Kent defines a right as that which anyone is entitled to have or to do or to require from others, within the limits prescribed by law, but as we have seen, rights are limited by duties which impose upon each man the obligation not to exact under color of law rights or privileges which are denied to his neighbor. In this age of Cyclopean competition between gigantic corporations, capitalized, organized and marshalled to produce results regardless of consequences, the necessity for wise and judicious state control and regulation of these competitive industrial and commercial agencies and forces become supremely important to the welfare of the community, as well as the individual. The ever increasing complexities of modern social, industrial and business relations render such control vital and paramount.

Before it can be said that a municipality can, in advance, by ordinance or contract, foreclose the state from exercising this right of regulation, it must appear beyond question that the right was clearly and unmistakably conferred by the Legislature, and if the statute conferring such authority amounts to a waiver of the right of the state to exercise its soverign power to prevent discrimination, extortion and wrong, then such statute will ·be held unconstitutional, for surely even the state may not contract or bargain away its police powers.

It has been frequently held in this state that in a comprehensive sense, the police power of the state embaraces the state's whole system of internal regulation, by which the state seeks not only to preserve public order, but also to establish for the intercourse of citizens with citizens, those rules and regulations which are calculated to prevent a conflict of rights and to secure to each an uninterrupted enjoyment of his own rights, so far as is reasonably consistent with the like enjoyment of rights by others. (Seemer v. State, 21 O. C. C., 440.) It may be necessary to summarize in a general way the provisions of the public utilities acts to ascertain if their purposes do not fall strictly within this classification of internal state regulation.

Before 1911, the regulation of public service corporations was practically confined to railroads, street railways and common carriers. On May 31, 1911, the General Assembly passed an act, changing the name of the railroad commission which had charge of the regulation of such public service corporations, to that of the public service commission, defining its powers and duties with respect to public utilities. O. L. 102, 549.

On April 18; 1913, another act was passed to "Create the Public Utilities Commission of Ohio,· to prescribe its organization, its powers and its duties," and to repeal certain sections of the former act. O. L. 103, 804.

In these two acts will be found the statutes regulating public utilities now in force in Ohio. The Public Utilities Commission is vested with plenary power and jurisdiction to supervise and regulate all public utilities, including electric power and light companies, within the limits prescribed by the provisions of these acts.

"The powers of the Public Utilities Commission are conferred by statute, and it possesses no authority other than that vested in it." *Cincinnati* v. *Public Utilities Com.*, 96 O. S., 270.

An examination of the act as a whole, however, clearly discloses that these powers are quite large and cover the whole field of regulation, and sharply restrict and limit the authority of municipal corporations to make valid franchise contracts with a public service utility, unless the power to do so is clearly conferred upon it. Where such power of control is clearly conferred upon a municipality, the Commission can not change rates provided for in a valid contract between such municipality and a public utility (*Interurban Ry. Co.* v. *Public Utilities Com.*, 97 O. S., —). The opinion in this case has not yet been published. The syllabus, however, will be found in the *Ohio Law Reporter* of July 1, 1918, page 87. A copy of the opinion, however, is before the court, and as it contains the last word upon this subject by the Supreme Court, some reference to it will not be inappropriate.

The court had under consideration certain grants by different municipalities and counties through which the complainant, an interurban railway company, runs. At the time these grants were made by these sub-divisions of the state, the power to do so was conferred by Section 3443, Revised Statutes now 9113, General Code, which provides, among other things that the—

"Council and commissioners (of counties) shall have power to fix the terms and conditions upon which such railways may be constructed, operated, extended and consolidated."

It will be here observed that the power to make a contract protected by constitutional guarantees, is clearly and unmistakably conferred. The Supreme Court was careful, however, to point out that there was a limit even to the delegation of such power by the Legislature. Parts 2 and 3 of the syllabus are as follows:

"2. The state can not be deprived of its right to the proper exercise of the police power; and none of its sub-divisions can bind itself by contracts which are or which may become deleterious to the peace, order, health or morals of the people.

"3. A contract concerning the proprietary rights, and harmless in itself, made by a municipality in the exercise of power clearly conferred, is protected by the constitution, and the police power can not be invoked to abrogate or impair it."

We have here by plain intimation, if not in express terms, a clear and emphatic declaration that a state can not confer upon one of its sub-divisions power to make contracts which are harmful "or which may become deleterious to the peace, order, health or morals of the people." Or, in other words, the state can not barter or bargain away an authority or soverignty essentially necessary to enable it to accomplish the object and purposes of its creation. The rule laid down is simply this, that "in the exercise of power clearly conferred," a municipality may contract concerning proprietary rights, provided the contract in itself is not injurious or harmful to the public welfare. A proprietary right is the right of an owner or proprietor, and a contract or stipulation for the benefit of a limited number of "private consumers," as provided for in Section 6 of the ordinance under consideration, is quite obviously not a contract between the village of Lakewood, in its proprietary capacity, and the defendant as a public utility.

In *Peoples Telephone Co.* v. *Lewis*, 151 Wis., 75, the court had under consideration a special contract made between the telephone company and a stockholder, which was executed befor the passage of the public utilities act in that state. This contract was embodied in a stock certificate issued to the stockholder. It was held that this was a valid contract, as it was protected by Section 1797-M-91 of the utilities act, which provides that—

"The furnishing by any public utility, of any product or service, at the rates and upon the terms and conditions provided for in any existing contract executed prior to April 1, 1907, shall not constitute a discrimination within the meaning specified."

It will be noticed that this section was copied almost literally by the General Assembly of Ohio several years later, and is now a part of the public utilities act to which reference will

be hereafter made. It was sought to distinguish this case from the case of *Superior* v. *Douglas Telephone Co.,* 141 Wis., 363, where the city of Superior, in its proprietary capacity, entered into a contract as a consumer for free telephone service, but the court clearly distinguishes the difference between the two cases, holding that in the latter case the city of Superior in its proprietary character, entered into a contract for free telephone service with an existing telephone company for a valuable consideration, the consideration being that the telephone company agreed to maintain a certain number of free telephones for the City of Superior, in consideration of the city permitting it to make alterations in the city hall or public buildings, for the express use and benefit of the telephone company.

There are three classes of contracts which a public service corporation may make with a municipality and its inhabitants; first, contracts with the municipality in its proprietary capacity. These, if not harmful or contrary to public policy, and provided the consideration is not compensation for the consent to occupy its streets and public places, are not inhibited by the public utilities act. Second, contracts with individuals, patrons of customers. These, unless unreasonably unjust or unconscionable, are saved by Section 614-19, General Code. Third, contracts which form an element of or are in effect created by the corporate franchise or grant given to the public service corporation as a part of its consent to the use and occupancy of its streets and public places. All these are subject to and are superseded by the public utilities act, unless the authority conferred by the state upon the municipality with respect to such grants is clear and unmistakable.

In *Peoples Telephone Co.* v. *Lewis,* 151 Wis., *supra,* the court, in construing the section of the Wisconsin act from which Section 614-19, General Code, is copied, says, page 77:

"This section was held, in *Superior City* v. *Douglas,* 141 Wis., 363, to have been intended to preserve existing agreements with public utility corporations from being affected by the public utility law, and to be efficient for that purpose as to mere contractual matters, such as ordinarily occur *inter partes.* * * * Such ordinary contracts being distinguished from such as form an

element of a corporate franchise, *the latter being held superseded by the Public Utility Law,*"

while the former are preserved by the saving clause or section referred to.

By Section 6 of the ordinance under consideration, the village of Lakewood undertook to perpetually preclude and foreclose the power of the state to regulate the charges of the defendant as a public utility to all prospective consumers of electric current in the village of Lakewood, except a limited number who might possibly fall within its provisions. This we hold it had no right to do, and its act in so doing was *ultra vires.* The validity of this ordinance and the grant therein made is to be determined by the laws in effect and in force at the time it was passed, and as we have seen, the only grant of power to the village at that time with respect to electric light plants was contained in paragraph 15 of Section 1536-100 Revised Statutes, which only conferred upon the village authority to erect, install, maintain and operate an electric light plant for its own use, in its proprietary capacity. This statute did not confer upon the village authority to erect and. operate such plant for the purpose of supplying electric light to its citizens. *Jackson, a tax-payer, etc.,* v. *City of Nelsonville, supra.*

Nor did this statute confer upon the village authority to contract with others to furnish its citizens with such light. This is quite evident from the language of the constitutional amendment of September, 1912 (Section 4, Article XVIII), which gives municipalities plenary power to own, construct, lease or operate public utilities.

"The product or service of which is to be supplied to the municipality or its inhabitants, and *may contract with others* for such product or service."

It is quite evident that the members of the constitutional convention had serious doubts that municipalities had such power or that the Legislature could confer it, in the absence of a constitutional provision to that effect. Prior to this constitutional amendment, no one will contend that a municipality had any in-

herent right to construct, own and operate a public utility, outside of the maintenance and operation of water works, and the courts have been inclined to doubt whether the legislatures of the states could confer such power.

A brief resume of the scope and the purpose of the public utilities acts may not be inappropriate. These acts provide, in a general way, that every public utility shall furnish necessary and adequate service, which shall be reasonable and just, and that every unjust or unreasonable charge for such service is prohibited and declared unlawful. No public utility shall give any undue or unreasonable preference or advantage to any person, firm, corporation or locality. The law provides that public utilities shall print and file with the commission within ninety days after the act takes effect, schedules showing rates, classifications and charges for service, but any firm, person or corporation may take exception to such schedules if they are in any respect unjust, unreasonable, preferential or discriminatory, or in violation of law, and this complaint the commission must hear and determine.

The council of a municipality is given power, whenever an application is filed with it by any person, firm or corporation, to require by ordinance or otherwise, the public utility to make such additions or extensions to its distributing plant within the municipality, which shall be deemed reasonable and necessary in the the interest of the public. Any requirements or orders made by the council, however, are subject to review by the commission, and in determining the practicability of such additions and extensions, the council and the Public Utilities Commission shall take into consideration the supply of the product furnished by such public utility available and the returns upon the interest, and expense of constructing such extensions and additions, and the amount of revenue to be derived therefrom, as well as the earning power of the public utility as a whole.

Re-hearings may be had before the Public Utilities Commission by any party who feels aggrieved by any order made by such commission, and if upon such re-hearing, any party is dissatisfied with the final order made by the commission, proceedings may be had to obtain a reversal, vacation or modification thereof, by petition in error filed in the Supreme Court of this state.

That is, any decision rendered by the commission is appealable to and may be reviewed by the Supreme Court.

When the defendant in this case filed its schedule of charges for extensions and service, as alleged in its second defense, the plaintiff could have demanded a rehearing, and if not satisfied with the conclusions reached by the commission, an appeal could have been taken to the Supreme Court of the state.

Before the enactment of the utilities statutes, the need of extending regulation of all public utilities to every public service corporation was recognized and enforced in many states long before the state of Ohio awoke to the necessity for such regulation. The provisions of our statutes are copied in large measure from the laws of these states. The purpose and object of this legislation is quite obvious and apparent. On the one hand, public service corporations were constantly growing powerful, aggressive and extortionate. On the other hand, the councils of municipalities, so far as they had the power or authority, were enforcing upon these corporations burdensome and onerous restrictions and obligatory duties, and where they did not have the power, councils were attempting to exercise it, and public service corporations were constantly called upon to combat the passage of discriminatory ordinances. The primary object of all public utilities legislation is to obtain for *all* citizens of the state, without discrimination, the best possible service consistent with the practical operation of the utility and the payment to its stockholders of a fair and reasonable dividend upon the capital invested. More than this the state can not justly demand, nor can a public service corporation in justice be expected to accept less. While the creation of corporations is a state function, and while corporations are, as a rule, organized under general laws, yet certain corporations are created and owe their existence to special acts and derive their powers therefrom.

The defendant claims it falls within the latter class and that it was organized under and derives its powers from an act of the General Assembly passed January 26, 1887 (84 O. L., 7), which made the laws relating to magnetic telegraph companies applicable, so far as practicable, to electric light and power companies, and therefore its right and power to occupy the streets

of a municipality was derived directly from the state. The act of the General Assembly of April 21, 1896 (92 O. L., 205), now Sections 9192 and 9193, General Code, however, provide that such companies shall not occupy the streets, lanes and alleys with their equipment, to conduct through and thereon electricity for lighting, heating and power purposes "without the consent of such municipality."

The plaintiff contends that the effect of this act of 1896, Sections 9192 and 9193, General Code, is to subject such companies to municipal control alone, and cites *Hardin-Wyandot Lighting Co. v. Village of Upper Sandusky*, 93 O. S., 428, in support of its contention. The only question decided in this case is that when an electric light and power company which has occupied the streets and public places of a city or village with its equipment, voluntarily and without the consent of the municipality, withdraws its service and removes and dismantles a portion of its equipment, it can not again return and repossess itself of its rights without the consent of the municipality.

It is somewhat doubtful if the doctrine of this case sustains the contention of the plaintiff, and it is equally as doubtful if it leaves the claim of the defendant, that it derives its power to occupy the streets of a municipality from the state, wholly intact. The doctrine of *Hardin-Wyandot Lighting Co. v. Village of Upper Sandusky*, 93 O. S., supra, is largely to the effect that the Legislature, for reasons appearing sufficient, in April, 1896, made the right of electric light and power companies to occupy the streets and public places of cities and villages with their poles, wires, and other equipment, dependent upon the consent of the municipality; that the rights of these companies as corporations deriving powers directly from the state under the magnetic telegraph act, still in great measure persist, is quite evident from Section 9179, General Code, which expressly provides that the municipality shall not demand or receive any compensation for such consent. The municipality may give or refuse its consent to such corporations to occupy its streets and public places, but it has no power to give its consent upon terms as to charges and service that the state may not change from time to time, as circumstances and changing conditions may demand

or render necessary for the public welfare, unless, as has been said, the power to do so is expressly and in express terms conferred.

The able and learned judge who wrote the opinion in *Hardin-Wyandot Lighting Co.* v. *Upper Sandusky,* 93 O. S., *supre,* says on page 439 that—

"The act of 1896 disclosed that the Legislature was not content to clothe the electric light companies in municipalities with the same powers with which it had vested telegraph and telephone companies. The change was made in the light of experience. *  *  * There is a clear distinction between telegraph and telephone companies on the one hand, and electric light companies on the other. *  *  * Telegraph and telephone company systems pervade the entire state. They pass in and out of cities and villages and through the rural districts, connecting the whole in a vast net-work. *  *  * As a general rule, an electric light company is formed for the purpose of furnishing light to the municipality in which it is located and to its people."

It is quite evident that, if not *all,* at least *some* of the powers conferred by Section 9170, *et seq.* General Code, still remain with the electric light and power companies, and that it applies, to some extent at least, to a class of corporations deriving powers directly from the state, and because of this fact alone, the claim of the defendant that Section 6 of the ordinance under sonsideration is *ultra vires* of the power of the village of Lakewood, has considerable merit. The claim of the able and learned judge, however, that there is a clear distinction between a telegraph and telephone company, so far as it is based upon the reason that—

"as a general rule, an electric light company is formed for the purpose of furnishing light to the municipality in which it is located and to its people,"
while in the main true when the opinion was written, can not be accepted in the light of conditions now prevailing.

Science never sleeps. Progress in the application of natural forces is only limited to the capacity of mind organized to grasp and utilize potential possibilities to an extent not even dreamed of a few years ago. There is a large electric generating plant in West Virginia near the Ohio River that is transmitting electricity for power and other purposes to the city of Canton, and is under

contract to extend its lines to the city of Akron, only a few miles from the city of Cleveland. In the state of Montana, the tremendous water power facilities of the Rocky Mountains are being utilized to generate electric current that is transmitted all over the state and is being successfully used by railroads as a motive force instead of steam on their heaviest or steepest grades. A few years ago the cost of transmitting electric energy any considerable distance was prohibitive. This was mainly due to the fact that the insulation was lead covered cables, which because of weight, required short pole spacing, but a very much lighter insulation has been discovered, and current is now carried on the ordinary standard pole lines. Such current and power is now transmitted on the line of the St. Paul Railway Company a distance of 690 miles.

Again, by the use of high frequency changes, alternating currents of one hundred thousand volts may be transmitted long distances. The current is transformed or stepped up at the generating station by remarkably efficient machinery, and stepped down at any point desired and used at low pressure. It is simply a question of cost as between freight charges on coal and the erection of lines for the transmission of electric current. Undoubtedly in the near future the defendant in this case, instead of paying freight on coal from the mines to the city of Cleveland, will generate its power and energy at some point where the coal is mined, and transmit it over wires to points of designation. Even the dangers apprehended by the able and learned judge are being rapidly eliminated or at least very greatly minimized. Even today, in the language of this learned judge, electric light and power systems "pervade the entire state, they pass in and out of cities and villages and through the rural districts, connecting the whole in a vast net-work." Not only is that true in this state, but it is true in most states, especially in the west where water power is available.

In this age, when man, with strident voice, "winged with red lightning," throws the news of a great victory from Eiffel Tower in the city of Paris into etheric space, and almost instantly silently plucks it out of the air at Washington, D. C., judicial decisions can not be wholly based upon conditions that, though

they seem miraculous today, may tomorrow be discarded as being antiquated and obsolete. The day is at hand when the denizen of the country, as well as of the city, will be using for light, heat and power, electricity transmitted on pulsing wires from generating plants a thousand miles away.

When the General Assembly placed electric light and power companies in the same class with telegraph companies, it unconsciously performed an act that was prophetic of coming events that cast light, not shadows, before. The possibilities for purposes of production, transportation, and social comfort of this natural force, the latest harnessed by man and made the genii of his will, are unthinkable and are such as were never dreamed of in Utopia or conceived in the highly specialized imaginative brain of Jules Verne.

Section 21 of the act of May 31, 1911 (O. L., 102), 549, now Section 614-19, General Code), provides that—

"The furnishing by any public utility of any product or service, at the rates and upon the terms and conditions provided for in any existing contract, executed prior to the passage of this act, shall not be construed as constituting a discrimination, or undue or unreasonable preference, or advantage within the meaning specified."

This is substantially the language used in Section 1797-M-91 of the Wisconsin statute, passed in 1907, and it was undoubtedly copied from that act. It is a well recognized proposition of law that where a statute is largely taken or borrowed from another state, the interpretation placed upon it in the state where it originated will govern in any state that subsequently adopts it, and there is a presumption that the General Assembly of Ohio, in adopting this language and the terms used, had the construction placed upon it in Wisconsin in view.

In *Kenosha* v. *Kenosha Home Telephone Co.*, 149 Wis., 338, it was held that the contract referred to in this provision of the law was a contract between the utility and one of its consumers or patrons. See also the cases of *Superior* v. *Douglas Telephone Co.*, 141 Wis., 363, and *Peoples Telephone Co.* v. *Lewis*, 151 Wis., 75, already referred to.

The so-called contract in Section 6 of the ordinance under consideration is not saved by this section, as it is, if anything, merely such right as forms an element of a corporate franchise which is superseded by the public utilities act or any amendments thereto that the state may deem essential to enact in the interest of the public welfare.  Obviously if a contract in any sense, it must be held that whatever force or validity can be claimed for it, must be based upon the corporate grant or franchise of the village of Lakewood to the defendant.  By no possible interpretation can it be said to be a contract between the defendant and the village in its proprietary capacity, or between the defendant and those "private consumers," for whose benefit it was inserted in the ordinance.

Counsel for plaintiff has filed a supplemental brief, in which it is claimed the power of the village to pass the ordinance under consideration is amply conferred by Section 3471a, Revised Statutes, (84 O. L., 7), and other statutes in force at that time. This Section 3471a, Revised Statutes, was amended in 1896 (92 O. L., 205), and is now practically embodied in Sections 9192 and 9193, General Code.  In *Light Co.* v. *Upper Sandusky, supra,* the court said, page 441, that the purpose of the amendment "was to invest the municipality itself with power to make the grant." Further the court says:

"The elimination of Section 3461, Revised Statutes, and the use of the word 'alone,' abrogates the power of the probate court to act in such cases, and this is followed by the express provision requiring the *consent* of the municipality."

The court is therefore convinced that Sections 9170, *et seq.,* General Code, as now in force, do not "clothe electric light companies with *all* the powers of telegraph and telephone companies."  The court is careful to avoid saying that electric light companies are not clothed with some of the powers of telegraph and telephone companies.  Section 3471a, with the amendment thereto, relate to powers and rights of the utility corporations referred to, rather than to powers conferred upon municipalities.  The same may be said with respect to Section 3471-3, Revised Statutes, now 9195, General Code, as well as the other sections cited.

The most that can be claimed for any of the statutes cited is that by implication some power of regulation is reserved in the statutes in force in 1907 to municipalities with respect to electric light and power companies, but, as has been seen, the overwhelming weight of authority is that a municipality can not preclude or foreclose the state from the exercise of its police power of regulation, unless the authority to do so is clearly and unmistakably conferred.

Much reliance is placed upon the *City of Columbus* v. *Columbus Public Service Co.*, in which the common pleas court, Dillon, J., held (4 N. P. [N.S.], 329) that—

"There is an entire absence of express power, either in the municipal code or previous statutory provisions, whereby a municipality may grant to a lighting company the right to jointly use municipal poles."

The decree of the common pleas court was reversed by the circuit court, which action of the circuit court was affirmed by the Supreme Court without report.  78 O. S., 392.

A judicial decision can only serve or operate as a precedent for future determinations in similar or analogous cases, that is, the facts in the case in which the precedent is invoked as a governing or controlling rule, though differing in some degrees, must be closely alike or similar to the facts in the case in which the previous decision was rendered.

The facts in this case are that the city of Columbus owned a municipal lighting plant, and by ordinance in 1902, granted the light company authority to use its poles, that is, gave its consent to the public service company to string its wires on the city's poles.  As the law then stood, as we have seen, a municipality had the right to give its consent to an electric light and power company to occupy its streets, alleys and public places with its equipment, for the purpose of furnishing light to its people, and having this power. it surely had that power to permit such a company the joint use of its own poles for the same or similar purpose.

The facts in this case differ very materially and are in no respect analagous to the facts in *Jackson* v. *Nelsonville*, supra.  In

the latter case, the City of Nelsonville, in 1905, owned and had in operation a municipal electric light plant for use in its proprietary capacity. In December, 1905, the city proposed to enlarge this plant at public expense and furnish light to its citizens, and the suit was brought by Jackson, as a tax-payer, to enjoin the city from so doing. The real purpose of the plaintiff was to prevent the city from entering into competition with private electric light companies. No ordinance had been passed·authorizing the city to furnish light to its inhabitants, but the case was not decided upon this point, as the question was squarely raised that the city had no implied or statutory power to furnish electric light to its citizens, and the distinction already referred to in Paragraph 15, Section 1536-100, Revised Statutes, that while the statute gave municipalities the right to provide, establish, maintain and operate natural gas plants, and to furnish the municipality and the inhabitants thereof with natural gas. it gave no power to a municipality to maintain municipal lighting, power and heating plants for the purpose of furnishing the inhabitants thereof with light, heat or power, was clearly pointed out in the briefs of the plaintiff in error. The language of the Supreme Court, in reversing the judgment of the circuit court, 77 O. S., 637, is

"Judgment reversed, because at the time of entering upon the enlarging of the electric plant, the statute conferred no authority for furnishing electricity to citizens."

It will be noticed that the decision of the court is not based upon the fact that the city of Nelsonville had not passed an ordinance, or that the people of the city had not, by vote of its electors, given the municipality any authority to furnish electricity to its citizens, but the decision is squarely based upon the fact that the statute conferred no authority upon the municipality to furnish electricity to the citizens thereof.

That this view was held by the bar and the General Assembly is clearly indicated by the fact that on February 28, 1908, Section 1536-100, Revised Statutes (Section 7-0 Municipal Code), 99 O. L., 34 was amended to confer such power. This amendment is now embodied in Section 3618, General Code. The decision in

*Jackson* v. *Nelsonville* was rendered February, 1908. The Legislature immediately proceeded to give to municipalities the power which the court said it did not have under the law as it then existed, to furnish electricity to its citizens.

It is therefore held:

*First.* The village of Lakewood has no authority, under its grant of power as a municipal corporation, in 1907 or before that time, to erect, maintain and operate an electric lighting plant for the purpose of furnishing its inhabitants with light, heat or power, and those of its inhabitants who had entered into contracts with the village for electricity for such purposes acquired no rights under such contracts that could be legally enforced.

*Second.* The village of Lakewood had a right to sell and transfer to the defendant, for a valuable consideration, its municipal lighting plant *in situ,* including all the appurtenances, appliances and equipment thereunto belonging, and having done so and having accepted and used for its benefit the price agreed upon, and the defendant having appropriated and entered into possession of the plant and equipment *in situ,* with the acquiescence and by virtue of the affirmative acts of the village, the transaction became *fait accompli.*

*Third.* The village and city of Lakewood having, by acquiescence and by affirmative acts, permitted the defendant to use and occupy its streets and public places with its equipment, and the defendant having furnished the village and city of Lakewood and its people with light, heat and power, uninterruptedly and without objection for nearly twelve years, the intention of the municipality to give to the defendant the consent to occupy its streets and public places with its equipment, provided by law, will be presumed, and because of this acquiescence, acceptance and user, the parties will be estopped from taking advantage of a situation created by their own acts and conduct.

*Fourth.* The ordinance of the village of Lakewood of March 18, 1907, No. 454, was illegally passed and therefore its provisions regulating charges for service extensions and additions are void and not binding upon either of the parties.

*Fifth.* If the ordinance had been legally passed or assuming its validity, the grant in Section 6 thereof does not constitute such

contract as is protected by constitutional provisions forbidding the enactment of laws impairing the obligations of contracts. The provisions of said Section 6 amount only to a grant or right upon condition, or a right based upon a mere expectation of the anticipated continuance of the laws then in force affecting such rights.

*Sixth.* The village of Lakewood in 1907 had, under the enumeration of powers granted to municipal corporations by the state, no authority to pass an ordinance containing the provisions of Section 6 of the ordinance of March 18, 1907, as such act on its part would be *ultra vires,* because, the grant being perpetual, it would preclude and foreclose the state from the exercise of its police powers to regulate the charges of and the mode of manner in which public utilities, shall perform their functions and render service equitably to all citizens without discrimination at any time, as necessity and changing circumstances demand.

*Seventh.* Contracts made between a public utility corporation and a municipality, in its proprietary capacity, not harmful to the public welfare, are not affected by the public utilities act; contracts entered into between such corporations and its patrons or customers individually, are protected by Section 614-19, General Code, unless contrary to public policy; contracts which inure to the benefit of the inhabitants of a municipality by virtue of a franchise granted a public utility corporation, and which grow out of and form an element of such franchise, are subject to and are superseded by the public utilities act, unless the power to grant such franchises and such rights is conferred by valid constitutional statutes in express, clear and unmistakable terms.

The petition will be dismissed, and notice of appeal noted on the court calendar.